IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
July 16, 2025
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., COMMONWEALTH OF VIRGINIA, ex rel., ALEXANDRA CROCKETT KEENEY GILE, as Executor of the Estate of Diane Crockett, BARRY GRAY-COUCH, and MARVIN FIELDS, JR., | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| CENTURY PARK CAPITAL PARTNERS, LLC and DOMINION CARE DAY TREATMENT, LLC, | ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 7:21-cv-420

By:    Michael F. Urbanski
Senior United States District Judge

## MEMORANDUM OPINION

Qui tam relators Alexandra Crockett Keeney Gile, as executor of the estate of Diane Crockett, Barry Gray-Couch, and Marvin Fields, Jr. allege that defendants Century Park Capital Partners, LLC and Dominion Care Day Treatment, LLC have violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and the Virginia Fraud Against Taxpayers Act ("VFATA"), Va. Code Ann. § 8.01-216.1 et seq., by submitting false claims to Medicaid in the course of their provision of youth behavioral and mental health services. 2nd Am. Compl., ECF No. 77-1. The United States and the Commonwealth of Virginia have declined to intervene. ECF No. 10; ECF No. 12; ECF No. 42. The matter is before the court on defendants' motion to dismiss for failure to state a claim, ECF No. 54, and on relators' motion for leave to file a second amended complaint, ECF No. 77.

1

Relators' proposed amendments to the second amended complaint do not affect the pending motion to dismiss. Accordingly, the motion to amend will be **GRANTED**, and the second amended complaint will be treated as filed. However, under a well-established exception to the rule that courts generally deny as moot pending motions to dismiss upon the filing of an amended complaint, the court will proceed by applying the pending motion to dismiss to the second amended complaint because "the [second] amended complaint has not addressed the pending motion's basis for dismissal." Carter-Spagnolo v. W. State Hosp., No. 5:20-cv-092, 2021 WL 4482978, at *2 (W.D. Va. Sept. 29, 2021).

Spanning 48 pages, the second amended complaint, like its predecessors, presents a mishmash of false claim schemes by which the relators contend defendants engaged in widespread fraud across the Commonwealth of Virginia. In order to analytically address the sufficiency of the myriad allegations under the standards of Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, the court has organized the allegations into eight false claim schemes.

Under this analytical framework, only one of the eight schemes is described in the second amended complaint with sufficient particularity to identify the who, what, when, where, and how of the alleged fraud. None of the allegations in the second amended complaint states a claim against Century Park Capital Partners, LLC. Accordingly, the motion to dismiss must be **GRANTED in part** and **DENIED in part**, leaving only relators' claims—identified in this memorandum opinion as comprising Scheme Two—against Dominion Care Day Treatment, LLC based on alleged false claims seeking compensation for more hours of therapeutic day treatment services than Dominion Care Day Treatment, LLC actually provided

to its clients. In addition, under the maximum applicable statute of limitations, no claim may be asserted by the relators for any false claim conduct prior to July 22, 2011.

## BACKGROUND

Until the program was discontinued in November 2019, Dominion Care Day Treatment, LLC ("DCDT") offered therapeutic day treatment ("TDT") services to Virginia students in elementary, middle, and high schools and in summer programs in the cities of Roanoke, Lynchburg, Fredericksburg, Alexandria, Richmond, Norfolk, and Virginia Beach, as well as the surrounding counties. 2nd Am. Compl., ECF No. 77-1, ¶¶ 41, 51.[1] TDT services are "structured therapeutic interventions for children with extreme behavioral problems," and TDT services include medication education and management, practice using interpersonal skills, and individual, group, and family counseling. Id. ¶ 36.

Medicaid paid DCDT for providing these services. Medicaid biannually provided DCDT with interim pre-payments to cover the next six months of services. Id. ¶ 49 c. The amount of the pre-payments was based on initial assessments of clients, which were conducted according to the H2016 TDT Initial Service Authorization Request Form. Id. ¶ 49 c (a). Via that form, DCDT would transmit information about its clients' diagnoses and treatment needs so that Medicaid could calculate the maximum number of hours of services qualifying for

---

[1] The amended complaint simultaneously abbreviated Dominion Care Day Treatment, LLC to "Dominion" and defined "Dominion" as a collective term referring to all defendants. Am. Compl., ECF No. 27 at 2. Defendants moved to dismiss on this basis, arguing that collectively defining defendants fails to satisfy Rule 9(b). Mem. Supp. Mot. Dismiss., ECF No. 55. Relators then moved to amend and submitted a proposed second amended complaint to clarify that "Dominion" refers to Dominion Care Day Treatment, LLC in most of the allegations in the amended complaint. ECF No. 77. However, for reasons described elsewhere in this memorandum opinion, the amended complaint's usage of the term "Dominion" was already comprehensible, even if the court had declined to grant relators' motion to amend. Regardless, to avoid confusion, this opinion abbreviates Dominion Care Day Treatment, LLC to "DCDT."

reimbursement for each child. Id. Then, during the pre-paid six-month period, DCDT employees were responsible for tracking what services were actually provided in order to determine how much of the prepayment DCDT was justified in retaining. To this end, every Friday, DCDT's Qualified Mental Health Professionals - Child ("QMHP-Cs") would provide DCDT management with attendance reports for the week reflecting services provided to each client. Id. ¶ 49 c (b). Every Wednesday, management then transferred the attendance report data from the previous week to the Medicaid claims processing system. Id. ¶ 49 c (c). An annual billing compliance review was conducted to determine whether the claims submitted were supported by documentation. Id. ¶ 58. If DCDT failed to maintain proper documentation, the Virginia Department of Medical Assistance Services ("DMAS") had the power to retract payments. Id. ¶ 61. Relators allege that "[DCDT] billed Medicaid in advance for the maximum 'allowed' time per client ($113 per unit x 3 units (five hours) = $339 x 5 days a week = $1,695 per week, per client), not the actual time that would be spent with each client." Id. ¶ 57(f).

Diane Crockett began working for DCDT in October 2017 as a QMHP-C to provide TDT services at Lee Waid Elementary School in Rocky Mount. Id. ¶ 43. Barry Gray-Couch began working for DCDT in November 2017 as a QMHP-C at Benjamin Franklin Middle School in Rocky Mount. Id. ¶ 44. Marvin Fields, Jr. began working for DCDT in 2009 as a Senior Lead Counselor for the TDT program at Ruffner Middle School in Roanoke, where he was soon promoted to site supervisor. Id. ¶ 45. In 2010, Fields was promoted to Program Manager, and in 2013, he was again promoted to Western Regional Program Director. Id. ¶¶ 45, 52. As Program Director, Fields trained and exercised oversight over QMHP-Cs in

Roanoke and surrounding areas, including by training QMHP-Cs on billing practices. Id. Fields was then promoted to State Director of Business Development in May 2017. Id. ¶ 45. In this role, Fields would travel to offices around the state. Id. ¶ 49 a.

Relators allege that, in these positions, they learned of a variety of fraudulent activities. Although relators assert that all of their allegations stem from a core of allegations about fraudulent billing for maximum hours, Opp'n, ECF No. 73 at 6-7, many of the allegations are not factually tethered to the alleged maximum billing. Accordingly, for clarity and in order to focus the issues moving forward, this opinion will disaggregate the allegations into the following eight schemes. In summarizing each scheme below, this background section will also preliminarily take note of the pertinent details missing from relators' allegations, laying the groundwork for later applying the heightened pleading standard for fraud claims.

## I.     Scheme One: Embellished Initial Assessments

Relators allege that DCDT's H2016 TDT Initial Service Authorization Request Forms were "often embellished, or up-coded to increase reimbursement." Id. ¶¶ 49 c (a), 55. Specifically, relators allege, "[DCDT] instructed the Clinical Supervisors and/or the Program Coordinators to 'be creative' when diagnosing a client on the initial assessment." Id. ¶ 57 (a).[2] "Consequently, those Clinical Supervisors and Program Coordinators submitted initial assessments to [Medicaid] that contained exaggerations and fabrications of behaviors to

---

[2] Relators also allege that initial assessments were fraudulent in that, although "[a] Licensed Mental Health Professional (LMHP) or license-eligible, are the only ones who were qualified to prepare the H2016 TDT Initial Service Authorization for each client, . . . on numerous occasions [DCDT] had QMHP-C's and other non-license eligible personnel to complete the H2016." 2nd Am. Compl., ECF No. 77-1, ¶ 57 (a). The second amended complaint does not identify any occasions on which this occurred, identify any QMHP-Cs who improperly completed an initial assessment, or explain the connection between failure to comply with this requirement and Medicaid billing.

5

support the client's acceptance into the TDT program and the maximum billing for that client." Id. The second amended complaint does not identify which Clinical Supervisors or Program Coordinators participated in this scheme.

The second amended complaint further alleges that, to disguise the initial embellishment of diagnoses, "[DCDT] had the QMHP-Cs embellish, and/or up-code client behaviors in their [own subsequent] reporting." Id. ¶ 62 a. The second amended complaint does not identify when this occurred, the content of any embellished QMHP-C report, or which QMHP-Cs were involved.

The second amended complaint lists the initials of clients for whom [DCDT] allegedly documented fraudulent diagnoses. Id. ¶ 57 (d). The list does not describe the clients' diagnoses or why they were inaccurate.

The second amended complaint provides one specific account of an allegedly fraudulent diagnosis. Id. In Spring 2019, relator Gray-Couch was a backup QMHP-C for site supervisor Andre Levisy, and in this position, Gray-Couch learned about twin boys who were referred for TDT services at Ben Franklin Middle School. Id. ¶ 57 (d). When Jennie Sitman, who was an "LMHP-Eligible," completed the twins' initial assessment, she accepted one boy into the summer program and denied the other boy because his main diagnosis was autism, and DCDT had a practice of not accepting students whose primary diagnosis was autism "on the lower end of the spectrum . . . because they did not have the capacity to understand or work the program." Id. However, the twins' grandmother repeatedly called Levisy seeking to have the twin who was denied services reassessed so that both boys could be "in the same summer program so they would not be home alone during the day." Id. "Consequently, the

6

denied twin's primary diagnosis of autism was fraudulently changed to a diagnosis that qualified for entry into the TDT program." Id. The second amended complaint does not explain what behaviors the boy demonstrated that were consistent with autism but not with the (unidentified) diagnosis upon reassessment or otherwise provide details indicating whether the reassessed diagnosis was false. The second amended complaint does not connect DCDT's alleged attempt to help this individual grandmother with her childcare needs to a broader scheme to maximize enrollment or potential billing.

## II.    Scheme Two: Fraudulent Billing for Maximum Hours

After pre-payment amounts were calculated based on the initial assessments, DCDT was required to substantiate the portion of the pre-payments DCDT had actually earned by delivering services. However, relators allege that DCDT consistently relied on false documentation to bill for the maximum amount prepaid, while actually delivering far fewer hours of services. Id. ¶ 49 c (c).

Relators allege that DCDT's billing for maximum hours was frequently facially fraudulent because DCDT billed for more hours of services than a given QMHP-C could conceivably provide in a single school day. Id. ¶ 49 c (c). The second amended complaint provides at least six examples of mathematically impossible attendance sheets submitted by QMHP-Cs on dates during the school year ranging from 2009 until 2014:

- On unspecified occasions while he was serving as a Senior Lead Counselor, presumably in 2009 or 2010 and presumably at Ruffner Middle School in Roanoke,[3]

---

[3] This timeline is assumed based on the allegation elsewhere in the second amended complaint that Fields served as a Senior Lead Counselor at Ruffner Middle School in Roanoke beginning in 2009 until he was

Relator Fields himself allegedly served 13 clients and billed the maximum five hours per day for each client, leading him to bill for 65 hours in a single day. Id. ¶ 56.

- On November 12, 2012, QMHP-C Goodman of Westside Elementary allegedly billed five hours for each of five clients, totaling an implausible 25 hours of services in a 6.5-hour school day. Id. ¶ 58 (1).

- On January 7, 2013, QMHP-C Hunter of James Madison Middle School allegedly billed five hours for each of four clients, thereby claiming to have provided 20 hours of services in a 6.5-hour school day. Id. ¶ 58 (2).

- On February 4, 2013, QMHP-C Hash of Lucy Addison Middle School allegedly submitted an attendance sheet reflecting that he provided five hours of services to each of four clients for a total of 20 hours of services in a 6.5-hour school day. Id. ¶ 56.

- Also on February 4, 2013, QMHP-C Johnson of Lucy Addison Middle School allegedly reported 18 hours of services in a single 6.5-hour school day, with five hours of services being attributed to each of three clients and an additional three hours of services being attributed to a final client. Id.

- On February 24, 2014, QMHP-C Hicks of Westside Elementary School billed five hours for each of five clients, totaling an unlikely 25 hours of services in a 6.5-hour school day. Id. ¶ 58 (3).[4]

---

promoted at some point in 2010. 2nd Am. Compl., ECF No. 77-1, ¶ 45. This timeline is relevant for statute of limitations purposes, as explained below.

[4] Westside Elementary School, Lucy Addison Middle School, and James Madison Middle School are located in the City of Roanoke. See https://www.rcps.info/domain/143. Even in evaluating motions to dismiss, courts

Relators support the second amended complaint's allegations of implausible hours with Exhibit 1 attached to the amended complaint. Ex. 1, ECF No. 27-1 at 1-12. This document purports to list, for several weeks during the school year from January to November 2012, the weekly hours billed for each client of two QMHP-Cs at Westside Elementary, Goodman and Hicks, and two QMHP-Cs at Lucy Addison Middle School, Johnson and Hash. The document then provides a calculation of the total weekly hours billed to Medicaid by each QMHP-C minus the actual hours available for rendering services in a given week, assuming a 6.5-hour school day, resulting in a tabulation of the "total weekly hours fraudulently overbilled to Medicaid per single QMHP-C." Id. Relators do not explain how they gathered the data used in this exhibit.

Relators allege that DCDT's practice of billing for implausible maximum hours continued during the summer program. Id. ¶ 63 a. They state, "With only a six-hour program day [during the summer program], and the limited number of therapists, providing even the two individual hours of intervention for each client was impossible and unrealistic, much less the 5 hours per client that [DCDT] had billed." Id.

In addition to alleging that DCDT sought compensation for mathematically impossible hours of services, relators offer the following additional illustrations of how QMHP-Cs provided fewer hours of actual services than claimed:

- "Dominion lured the Program Director with bonuses and incentives based on hours/units reported and billed, and QMHP-Cs with possible termination if their

---

"routinely take judicial notice of information contained on state and federal government websites." United States v. Garcia, 855 F.3d 615, 621 (4th Cir. 2017).

reported hours/units were not maximized to the allowable limit, rather than reporting the actual hours of therapeutic services delivered." Id. ¶ 53.

- "Lynchburg was started by Program Director Larry Lacina and every QMHP-C in that area billed clients in the same way in TDT . . . if the child was in the building on a school day then bill maximum hours for that child. This was a statewide billing practice, not just in Roanoke and Franklin County." Id. ¶ 54.

- DCDT submitted "false or misleading information about services performed." Id. ¶ 59. This portion of paragraph 59 falls within Scheme Two to the extent that this allegation refers to the use of false or misleading information to seek reimbursement for the maximum hours of services for which a program participant is eligible, as opposed to the actual hours of TDT services provided to such a program participant by DCDT.

- Relators allege that even as DCDT was billing for the maximum hours of services per client, DCDT was, in fact, falling short of the minimum requirement that services last at least two hours per session. Id. ¶ 62 c; see also 12 VAC 30-50-226(B)(1) ("Day treatment/partial hospitalization services shall be provided in sessions of two or more consecutive hours per day . . . ."). Relators allege, "Although [DCDT] failed, for nearly every client, to provide the mandated minimum of 2 hours of individual therapeutic services, [DCDT] falsely documented that it had provided those services and failed to reimburse Medicaid for monies it received for the prescribed services it failed to perform." Id. ¶ 62 b. The second amended complaint lists individual students by initials at specific

schools "for which Dominion received advanced payment and then falsely recorded they provided services that were not rendered." Id.

- Relators allege that DCDT directed QMHP-Cs to "conduct short interactions with clients lasting a few minutes or even less," even while billing for sessions of maximum length. Id. ¶ 62 c.

- Relators allege that DCDT required QMHP-Cs to take a minimum of two 30-minute breaks during school hours "to complete their daily progress notes." Id. ¶ 62 a (second). Although the hour a QMHP-C spent recording notes was an hour not spent providing therapeutic services, relators allege that these hours were nevertheless billed to Medicaid. Id.

- Relators allege that, during the 2018 and 2019 summer programs, DCDT billed even for "group session[s] with 12 clients to one QMHP-C," where "none of the clients were receiving individual therapeutic services, or proper group therapy." Id. ¶ 63 f.

- Relators allege that DCDT sought maximum compensation for entire days of services on which no services were provided. Relators allege that DCDT falsely claimed that the TDT program was operational on days when the program was closed due to weather. Id. ¶ 73. The second amended complaint cites examples of dates on which the program was closed, such as the dates of several snow days and the dates of Hurricane Florence. Id.

- Relators allege that, during the 2019 summer program, DCDT "billed Medicaid for . . . 5 days a week for every client in the Summer Program even though the program

was being conducted during that period on four days a week (Monday through Thursday)." Id. ¶ 63 c.

• Relators allege that fake treatment notes were used to support billing for services never rendered. The second amended complaint provides the following example:

> During December 2018 through approximately May 2019, QMHP-C L.C. [at Benjamin Franklin Middle School] reported to Director Meaghan Keys that during her one-month medical leave[,] . . . every one of her clients[, including three identified by initials,] were marked absent, when in fact they were present. . . . It was discovered . . . that Program Coordinator David Southall had marked all the clients absent and that no treatment was provided to any of her clients during this one-month period. Director Keys then instructed the QMHP-C to prepare approximately 50 fictitious treatment notes for those clients that included two fictitious daily interventions for each of these clients. The documentation of the fictitious treatments for these claims were then put into the Lauris claims processing system, and [DCDT] billed Medicaid for the fictitious therapeutic services to those clients that were not delivered.

Id. ¶ 65.

• Relators allege that, during the 2018 summer program, "[DCDT] instructed the QMHP-Cs, including Relators, to prepare daily therapeutic notes for clients with whom they had never worked, or knew anything about their behavioral issues." Id. ¶ 63 h. Relators allege this was "done in order to support their submission to Medicaid for the maximum billable hours for each client." Id.

In addition to alleging that false documentation was produced by QMHP-Cs, relators also allege that supervisors altered attendance documentation. The second amended complaint states that, in spring 2019 and from August 1 through October 8, 2019, Shantell Dupree, who served as Program Director, at the direction of Meaghan Keys, who served as Director, altered

the attendance reports submitted by QHMP-Cs before submitting the reports to Medicaid so as to falsely represent that the maximum compensable hours of services were provided. Id. ¶ 73.

Relators allege that the maximum hours scheme began "at least by 2009 and continued up to the discontinuation of [DCDT's] TDT program on November 1, 2019." Id. ¶ 51. Relators support this claimed duration by alleging that site supervisor Andre Levisy told relator Gray-Couch that, when Levisy was hired in 2009, DCDT instructed him to bill the maximum Medicaid-funded hours rather than actual hours, which Levisy told Gray-Couch he continued to do until 2019. Id. ¶ 77.

In sum, Scheme Two alleges that DCDT collected payments from Medicaid for TDT services that were not provided. In various paragraphs of the second amended complaint, relators allege that DCDT made false claims seeking Medicaid payments based on the maximum hours that could be billed for a TDT program participant, despite providing fewer hours of actual TDT services. The court has identified the following paragraphs of the second amended complaint as comprising Scheme Two: ¶¶ 49(c), 49(d), 49(e), 51-54, 56, 57(f), 58, 59,[5] 62(b), 62(c), 62(a)(second), 63(a), 63(b), 63(c), 63(f), 63(h), 65, 73, and 77. For the reasons explained below, these are the allegations as to which the case will proceed to discovery.

---

[5] A portion of paragraph 59 alleges fraud in that DCDT submitted "false or misleading information about services performed." 2nd Am. Compl., ECF No. 77-1, ¶ 59. To the extent that this can be read to include false claims for TDT services DCDT did not perform, this allegation falls within Scheme Two.

### III.    Scheme Three: Fraudulently Retaining Clients Who Should Have Been Discharged

Relators allege that DCDT encouraged its employees to falsely document behavioral issues to justify retaining clients in the program who should have been discharged. Id. ¶ 68. On December 5, 2018, Program Director Dupree "instructed all QMHP-Cs in an email that 'our clients cannot score below a 50% daily.'" Id. Relators allege that this message was not merely an encouragement for QMHP-Cs to help clients achieve higher scores, but rather an instruction to QMHP-Cs not to rate a client below 50%, regardless of what the client's behavior warranted. Relators explain, "Ms. Dupree was thereby reiterating [DCDT's] directive that QMHP-Cs were never to rate a client with less than a 50% behavioral issue daily . . . because Medicaid would not pay for any client who fell below the 50% threshold behavioral rating." Id. The second amended complaint does not identify any QMHP-Cs who complied with such a directive by falsely rating clients above 50%. The second amended complaint lists initials of clients who allegedly should have been discharged, but the second amended complaint does not describe what behaviors these clients exhibited or how the behaviors were misreported to avoid discharge. Id. ¶ 69.

At the same time DCDT was allegedly encouraging employees to hide disruptive client behaviors to avoid discharging clients on that basis, relators allege that DCDT was also allegedly encouraging employees to hide improvements in client behaviors that would similarly have required discharge. Id. ¶ 69. In her email sent on December 5, 2018, Program Director Dupree wrote:

> When I'm completing my reports . . . I have noticed that there are a lot of high percentages. Please keep in mind that our clients

14

> we service are in our program because of the negative behaviors they display. When you are collaborating with the teachers, and they let you aware of a behavior the client displayed and you did not witness, you can still deduct points and process with the client.

Ex. 4, ECF No. 27-1 at 15. The second amended complaint does not explain whether any QMHP-Cs understood this email to be a directive to falsely downgrade clients' behavior scores (as opposed to a directive to standardize behavior scoring) or whether any QMHP-Cs followed through by falsely rating clients.

The second amended complaint further provides examples of two clients who were scoring above 90% for several months, indicating improved behavior that might have justified discharge, but were nevertheless kept in the TDT program. 2nd Am. Compl., ECF No. 77-1, ¶ 69. The second amended complaint does not describe whether there was a score threshold triggering discharge, which QMHP-Cs were working with the identified clients, at which sites these clients were receiving services, or what behaviors these clients were exhibiting.

### IV.    Scheme Four: Fraudulent Individual Service Plans

Relators allege that DCDT created fraudulent Individual Service Plans ("ISPs") during the summer program. On an unspecified occasion "[d]uring the 2009 through 2019 Summer Programs," DCDT allegedly had two QMHP-Cs complete twenty-five clients' ISPs by cutting and pasting from previous plans, without interviewing clients. Id. ¶ 63 g. Additionally, relators allege, "[O]n May 30, 2018, the Program Coordinator verbally instructed relator Crockett to prepare ISPs for Z.W. and J.A. by copying excerpts from the previous ISPs and pasting them into the ISPs that [Crockett] was asked to prepare, even though [Crockett] knew nothing about these clients." Id. A similar incident occurred on August 12, 2019, involving "QMHP-C T.J."

and a client named "G.S." Id. Relators further allege that in preparing updated monthly and quarterly ISPs, DCDT "had the QMHP-Cs copy the contents from the previous monthly and quarterly ISPs, and paste them into the updates, changing only the dates and adding a 'creative' line in the intervention section." Id. ¶72. Relators do not explain the function of ISPs or how they relate to Medicaid reimbursements. Relators do not describe the content of the allegedly fraudulent ISPs, except that the content was copied and pasted.

## V.    Scheme Five: False Dating of Documents

The second amended complaint contains at least three allegations concerning false dating of documents. First, relators allege that Program Director "Dupree, in an email dated November 29, 2018 @ 10:25 AM instructed employees to fraudulently date [] behavior reports with very specific dates regardless of the actual date of preparation, and to use her specified summary for their reports . . . ." Id.; see also Ex. 2, ECF No. 27-1 at 13. Relators do not explain how the documents at issue should have been properly dated, why the dates of the documents at issue were significant, or how they related to Medicaid reimbursement. Relators do not allege that any QMHP-Cs dated their behavior reports or drafted summaries in accordance with Dupree's instructions.[6]

Second, relators allege that "[DCDT's] January 17, 2019, Staff Meeting Memo fraudulently instructed employees to 'Make the [ISP] document date the same as the quarter reported end date.'" 2nd Am. Compl., ECF No. 77-1, ¶ 63 g; see also Ex. 3, ECF No. 27-1 at

---

[6] As to Dupree's "specified summary," examining the email itself in Exhibit 2 reveals that the summary language Dupree shared was an "example," not a direction for all employees to copy Dupree's language. Ex. 2, ECF No. 27-1 at 13.

14. Relators do not explain the relevance of the dates on ISPs or whether any QMHP-Cs followed the instruction to submit a falsely dated ISP.

Third, relators separately allege that DCDT encouraged QMHP-Cs to backdate parent signatures on ISPs to avoid disqualification for late signatures. 2nd Am. Compl., ECF No. 77-1, ¶ 67. Relators do not allege when or where or concerning which clients backdating occurred.

## VI.    Scheme Six: Miscellaneous False Documentation

Relators allege, "On December 9, 2010, . . . Relator Fields was forced to terminate QMHP-C, Mary Johnson for 'cutting and pasting from previous notes'" and was asked by "Mike Trojanowkski, owner of [DCDT], to complete and fix the November and December 2010 notes of Ms. Johnson." Id. ¶ 64. Management "conveyed" to Fields, "[S]ometimes this is a part of the game and it sucks because we do not want to pay back money or have medical look at us sideways. So sometimes we have to do what is necessary." Id. Relators do not explain how Fields' alteration of the notes related to "not want[ing] to pay back money" or otherwise describe the content of the notes, including if and how the notes were false. Id.

Relators allege that, in an email sent on September 13, 2019, Program Director Dupree instructed QMHP-Cs to copy and paste descriptions of interventions from documentation for charges Medicaid previously approved into the documentation for previously denied claims in order to resubmit and attempt to fix the deficiencies. Id. ¶ 76. The second amended complaint does not state that the information to be copied and pasted was false or otherwise describe the content of the documentation, and the second amended complaint does not allege that any QMHP-Cs complied with this instruction.

Paragraph 74 contains only slightly different cutting and pasting allegations. There it is alleged that DCDT supervisors and management copied information from monthly Behavioral Reports submitted by QCHP-Cs and pasted that information into their own reports, "falsely representing the observations in the QMHP-Cs' reports as their own." Id. ¶ 74. There is no suggestion in the second amended complaint that this adoption of the QCHP-Cs' observations in reports prepared by DCDT supervisors and management resulted in a false claim for payment.

## VII.    Scheme Seven: Anti-Kickback Violations

Relators also allege that DCDT violated federal and state anti-kickback statutes. Id. ¶¶ 78-81. Relators allege that, from 2009 when relator Fields began working for DCDT until 2015, DCDT operated an incentive program in which clients were rewarded for good behavior with "Dominion Dollars," which were provided in the form of gift cards. Id. ¶ 78. Relators allege that Dominion Dollars were an improper attempt to influence DCDT clients to remain DCDT clients by paying them for staying in the program. Id. The second amended complaint lists "Dominion Dollars" payments made to clients identified by initials during December 2010. Id. The second amended complaint does not explain whether any of the clients who received "Dominion Dollars" were otherwise likely to leave the program, and the second amended complaint does not identify which DCDT employees participated in handing out "Dominion Dollars."

Additionally, relators allege that, as Program Director during the 2017-2018 school year, relator Fields delivered gifts of basketball shoes to two local high schools with the intent to influence the schools to send DCDT TDT referrals. Id. ¶ 79. Then, in October 2018,

DCDT allegedly paid Caroline County School $2,100 to influence the school to refer TDT clients. Id. ¶ 80. The second amended complaint asserts that DCDT made similar payments on other occasions. Id. Relators do not allege that any referrals resulted from these gifts or payments. Relators do not state who was involved in the Caroline County School incident.

## VIII.  Scheme Eight: Miscellaneous Noncompliance with Medicaid Regulations

- Relators allege that DCDT placed QMHP-Cs in elementary schools that provided their own school-based family liaisons and "knowingly duplicated" services, in violation of Medicaid regulations. Id. ¶ 66 (citing 12 VAC 30-60-61(D)(6) ("Such services shall not duplicate those services provided by the school.")). The complaint lists schools where DCDT operated alongside family liaisons. Id. No details are alleged as to which services were duplicated as to which clients by which DCDT employees.

- Relators allege that DCDT violated Medicaid rules by failing to provide to QMHP-Cs a one-hour individual monthly supervision by a licensed clinical supervisor. Id. ¶ 70. The second amended complaint does not explain the connection between this alleged violation of Medicaid rules and DCDT's receipt of Medicaid payments, and the second amended complaint does not state when this failure to provide supervision occurred.

- Relators allege that DCDT did not provide clients who had not yet established a community mental healthcare provider with a mandated once monthly one-hour individual counseling session by a licensed clinical supervisor, instead providing fifteen-minute group activity sessions. Id. ¶ 71. The second amended complaint

does not identify any clients to whom this allegation pertains, any DCDT employees who failed to provide the required counseling sessions, or any other details connecting this allegation to a claim for Medicaid payment.

- Relators allege DCDT billed for services provided during transportation time during the summer program, contrary to guidance from Virginia Medicaid classifying "transportation" among "[a]ctivities that are not allowed/reimbursed" for TDT programs. Id. ¶¶ 63 d-e. Relators do not provide any examples of occasions on which this occurred.

Having alleged these fraudulent schemes, relators further allege that DCDT's management "was well aware of the pervasive Medicaid fraud that [DCDT] had been committing in its TDT program during the ten-year period prior to its November 1, 2019 shutdown." Id. ¶ 77. Relators base this allegation on one incident in which DCDT's upper management stated that they were aware that Medicaid was changing its policies for TDT programs due to pervasive fraud across TDT programs. Id. Relators also allege that DCDT management revealed their knowledge of fraud when DCDT changed its claims processing system from Lauris to Credible Documentation to guard against fraud and accusations of fraud. Id.

Century Park Capital Partners, LLC ("Century Park") purchased DCDT on July 31, 2018, after conducting an in-depth review and analysis of DCDT's operations. Id. ¶¶ 82-83. Relators allege that individuals affiliated with Century Park then joined DCDT's board. Id. ¶ 84. Relators allege that although Century Park learned of DCDT's fraudulent activities,

"Century Park did nothing to correct [DCDT's] continued fraud from the date it acquired [DCDT] until the TDT program was shut down" on November 1, 2019. Id. ¶¶ 87-88.

## PROCEDURAL HISTORY

Relators filed their first complaint on July 22, 2021. ECF No. 1. The complaint was sealed until the United States and the Commonwealth of Virginia declined to intervene in September 2022. ECF No. 10; ECF No. 12. The court unsealed the complaint on November 4, 2022. ECF No. 13. Defendants first moved to dismiss on March 22, 2023. ECF No. 20. In response, the amended complaint was filed on April 12, 2023. ECF No. 27. After the filing of the amended complaint, the United States and the Commonwealth of Virginia again moved to extend the time to determine whether to intervene in this case. ECF No. 30. As required by law, the court stayed all deadlines until further court order on July 11, 2023. ECF No. 35. The United States and the Commonwealth of Virginia again declined to intervene on June 10, 2024, ECF No. 42, allowing the court to then unseal the amended complaint, ECF No. 43. The court also lifted the stay on October 25, 2024. ECF No. 50. The parties stipulated to the dismissal of one of the original defendants, DYS Holding Company, on October 31, 2024. ECF No. 51. The remaining defendants, DCDT and Century Park, again moved to dismiss on October 31, 2024. ECF No. 54. After a hearing was held on the motion to dismiss on April 29, 2025, ECF No. 75, relators moved to file a second amended complaint, ECF No. 77. Defendants oppose the motion to amend. ECF No. 80.

The amended complaint and second amended complaint are identical in substance. Count I alleges DCDT violated the FCA; Count II alleges DCDT violated the VFATA; Count III alleges Century Park violated the FCA; and Count IV alleges Century Park violated the

VFATA. Id. Under the FCA, the complaint seeks triple the damages the United States has sustained due to the alleged fraud, a civil penalty, and costs, with relators to receive 25-30% in light of the United States' nonintervention. Id. Under the VFATA, the complaint seeks triple the damages the Commonwealth has sustained due to the alleged fraud, a civil penalty, and costs, with relators to receive 25-30% in light of the Commonwealth's nonintervention. Id.

In their motion to dismiss, defendants contend that relators have failed to plead fraud with the particularity required by Rule 9(b), that certain claims are time-barred, and that certain allegations fail to satisfy the elements of an FCA claim requiring materiality and actual submission of false claims to the government. ECF No. 55. One of several sources of confusion defendants identify in arguing that the amended complaint fails to satisfy Rule 9(b) is that the amended complaint collectively defines all defendants as "Dominion" on the second page of its introduction. In response, relators' second amended complaint seeks to clarify that the term "Dominion" refers only to DCDT. 2nd Am. Compl., ECF No. 77-1 at 2, ¶¶ 4-6. The second amended complaint further incorporates the following updates already recognized by court order: the correction of a previous misnomer of DCDT, ECF No. 57, the voluntary dismissal of DYS Holding Company as a defendant, id., and the substitution of deceased relator Diane Crockett with Alexandra Crockett Keeney Gile as the executor of Diane Crockett's estate, ECF No. 72.

## STANDARD OF REVIEW

### I.    Motion to Amend Complaint

First, as to relators' motion for leave to file a second amended complaint, Rule 15(a) provides that, after a party has exercised its right to amend its pleading once as a matter of

course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15(a) itself notes that "[t]he court should freely give leave when justice so requires." Id. As the Fourth Circuit has observed, "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006). Accordingly, "[the Fourth Circuit] [has] interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" Id. (quoting Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986)). Because none of these factors is present here, the court will **GRANT** relators' motion to amend.

Typically, permitting relators to file a second amended complaint would moot the pending motion to dismiss. Carter-Spagnolo, 2021 WL 4482978, at *2 ("District courts generally deny as moot pending motions to dismiss upon the filing of an amended complaint." (citing Young v. City of Mount Ranier, 238 F.3d 567, 572 (4th Cir. 2001))). However, as courts in this circuit have recognized, "there is an exception to this general rule. District courts may apply a pending motion to dismiss to an amended complaint if the amended complaint has not addressed the pending motion's basis for dismissal." Id. The Second and Fifth Circuits have similarly stated a rule that "when a plaintiff properly amends her complaint after a defendant has filed a motion to dismiss that is still pending, the district court has the option of either denying the pending motion as moot or evaluating the motion in light of the facts alleged in the amended complaint." Pettaway v. Nat'l Recovery Sols., LLC, 955 F.3d 299, 303-

04 (2d Cir. 2020); see also Rountree v. Dyson, 892 F.3d 681, 683-84 (5th Cir. 2018) ("If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.") (cleaned up); Wright & Miller, Federal Practice & Procedure § 1476 (3d ed. 2021) (same). Applying the pending motion to dismiss to the complaint as amended where the basis for dismissal is not affected by the amendment "promotes judicial economy by obviating the need for multiple rounds of briefing addressing complaints that are legally insufficient." Pettaway, 955 F.3d at 303. This approach "conserves both the court's resources and the Defendant's resources." Carter-Spagnolo, 2021 WL 4482978, at *2.

This case presents precisely the circumstances under which a pending motion to dismiss should be applied directly to a proposed amended complaint. Here, the amendments in relators' second amended complaint have no impact on the court's analysis of the motion to dismiss. Most of the proposed changes—correction of a misnomer, voluntary dismissal of a defendant, and substitution of one of the relators—concern matters already recognized by the court in prior orders. ECF No. 57; ECF No. 72. The clarification of the collective identification of defendants as "Dominion" was also unnecessary as the court already found the amended complaint comprehensible on this point, despite the somewhat imprecise drafting of the amended complaint's introductory section. The court would not have dismissed any claims due to the collective definition of defendants, even if no second amended complaint had been filed.[7] Although the proposed amendments are inconsequential, the court prefers to

---

[7] Defendants' position in their motion to dismiss is that by collectively defining defendants as "Dominion" in the introductory section of their amended complaint, Am. Compl., ECF No. 27 at 2, relators failed to "set forth with particularity each defendant's culpable conduct," United States ex rel. Ahumada v. Nat'l Ctr. for Emp. of

move forward with the marginal refinement of relators' second amended complaint, particularly considering Fourth Circuit policy favoring liberally granting leave to amend. Laber, 438 F.3d at 426. Because relators' amendment does not affect the bases on which the court will deny in part and grant in part the motion to dismiss, consideration for both the court's and parties' time and resources justifies simply applying the motion to dismiss to the second amended complaint. Relators themselves have requested that the court "simultaneously adjudicate both the motion to dismiss and [relators'] motion to amend." ECF No. 77 at 2.[8] Defendants will also benefit from the resolution of their pending motion to dismiss and will

---

the Disabled, No. 1:06-cv-713, 2013 WL 2322836, at *3 (E.D. Va. May 22, 2013), aff'd, 756 F.3d 268 (4th Cir. 2014). Because "[i]n FCA cases, the identities of those making the misrepresentations [are] crucial to the complaint," it would indeed be a problem if defendants were unable to "determine from the [complaint] what role each one is alleged to have played in the fraud." United States ex rel. Brooks v. Lockheed Martin Corp., 423 F. Supp. 2d 522, 527 (D. Md. 2006), aff'd in part, rev'd in part, 237 F. App'x 802 (4th Cir. 2007). Here, however, the amended complaint created no genuine cause for confusion. By examining the context in which the term "Dominion" was used, even before the proposed amendments of the second amended complaint, defendants here should have been able to "determine from the [amended complaint] what role each one is alleged to have played." Brooks, 423 F. Supp. at 527.

The amended complaint only began to refer to conduct that could conceivably be attributable to Century Park after paragraph 82, which stated that "[o]n or around July 31, 2018, Century Park purchased Dominion." Am. Compl., ECF No. 27, ¶ 82. The allegations thereafter explained that Century Park's part in the alleged fraud was that, in acquiring "Dominion" and acting as a "partner" in "Dominion's" operations, Century Park was aware of the fraud "Dominion" was committing but "did nothing." Id. ¶¶ 83-90. This language clearly disaggregated Century Park from "Dominion," a term which plainly referred to DCDT in all of the preceding substantive allegations of the amended complaint following the introduction.

This case is therefore distinct from those in which courts have been troubled by collective identification of defendants. Although it may be difficult to distinguish between "all of the Manufacturing Defendants" in a case in which multiple defendants played conceivably similar roles in the alleged fraud, see, e.g., Ahumada, 2013 WL 2322836, at *3, it is not difficult for a reader of relators' amended complaint to understand the natural distinction between the role played by DCDT, which actually operated the TDT program and therefore was plainly the subject of the amended complaint's allegations about fraud in the operation of the TDT program, and the role played by Century Park, which relators described as a private equity firm that only acquired DCDT late in the events alleged. Am. Compl., ECF No. 27, ¶¶ 4-6.

[8] Relators cite Lohrenz v. Bragg Cmtys., LLC, No. 5:22-cv-044, 2023 WL 3012006, at *4 (E.D.N.C. Mar. 31, 2023), report and recommendation adopted, No. 5:22-cv-044, 2023 WL 3011982 (E.D.N.C. Apr. 19, 2023), which concluded that "if a defendant alleges that an amended complaint suffers from the same defect as the original [c]omplaint, the court may address the motion to dismiss alongside the motion to amend." ECF No. 77 at 2.

not be harmed because the amendments do not alter the court's conclusion as to any of defendants' arguments for dismissal.[9]

## II.    Motion to Dismiss

Thus, the court can now proceed to address defendants' Rule 12(b)(6) motion, beginning with the proper standard of review. To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In evaluating a motion to dismiss under Rule 12(b)(6), a court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017).

In addition to satisfying this general plausibility standard, the allegations of fraud under the FCA and VFATA in this case must also satisfy the heightened pleading standard of Rule

---

[9] Defendants oppose the motion to amend. ECF No. 80. However, in their opposition to the motion to amend, defendants' chief complaint is that the motion to amend is nothing more than a re-argument of aspects of the motion to dismiss, meaning that further re-briefing would be a waste of the parties' time and resources. Id. at ¶¶ 5-7. The court agrees and finds that the best way to ameliorate this concern is to apply the motion to dismiss to the second amended complaint, a course that will have no effect on the substantive resolution of defendants' motion. Significantly, defendants themselves raise no additional arguments, instead falling back on their prior briefing and oral argument. Id. ¶ 7. The court similarly sees no need to address these motions separately.

9(b). Rule 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); see also United States ex rel. Taylor v. Boyko, 39 F.4th 177, 189 (4th Cir. 2022). "These circumstances are often referred to as the who, what, when, where, and how of the alleged fraud." United States ex rel. Wheeler v. Acadia Healthcare Co., 127 F.4th 472, 485 (4th Cir. 2025) (citing Boyko, 39 F.4th at 189 and United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008)). Such details are required "to prevent frivolous suits, stop fraud actions where everything is learned after discovery (i.e., fishing expeditions), and to protect defendants' reputations." United States ex rel. Nicholson v. MedCom Carolinas, Inc., 42 F.4th 185, 195 (4th Cir. 2022). At the same time, "[w]hile . . . significant detail [is required], '[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" Id. (quoting Harrison v. Westinghouse Savannah River Co. (Harrison I), 176 F.3d 776, 784 (4th Cir. 1999)). For the reasons that follow, relators have satisfied the heightened pleading standard of Rule 9(b) only as to their allegations identified in this memorandum opinion as falling within Scheme Two.

## ANALYSIS

In Count I as to DCDT and in Count III as to Century Park, relators allege that defendants have violated the FCA in four ways: presenting false claims to Medicaid, creating false records material to false claims, conspiring to commit these violations, and creating false

records material to obligations to pay Medicaid (reverse false claims). 2nd Am. Compl., ECF No. 77-1, ¶¶ 93, 106.

The FCA provides, in relevant part:

> [A]ny person who—
>> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>> (C) conspires to commit a violation of subparagraph (A), (B), . . . or (G);
>> . . . ; or
>> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(A)-(C), (G). In an FCA action brought by relators in which the United States declines to intervene, relators "shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages" and which "shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds." 31 U.S.C. § 3730.

To state an FCA claim, a relator must allege "(1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and

(4) the statement or conduct caused the government to pay out money or to forfeit money due." United States ex rel. Harrison v. Westinghouse Savannah River Co. (Harrison II), 352 F.3d 908, 913 (4th Cir. 2003) (citation omitted).

Additionally, relators allege in Count II as to DCDT and in Count IV as to Century Park that defendants have violated the VFATA. However, because "[t]he VFATA is practically identical" to the FCA, United States ex rel. Donohue v. Carranza, No. 1:22-cv-189, 2022 WL 3226191, at *8 n.6 (E.D. Va. July 1, 2022), "courts look to decisions interpreting the FCA in considering actions brought under the VFATA," Phipps v. Agape Counseling and Therapeutic Servs., Inc., No. 3:13-cv-166, 2015 WL 2452448, at *4 (E.D. Va. May 21, 2015). Accordingly, when dismissing an FCA claim, a court should dismiss any corresponding VFATA claim in tandem. United States ex rel. Rector v. Bon Secours Richmond Health Corp., No. 3:11-cv-038, 2014 WL 1493568, at *14 (E.D. Va. Apr. 14, 2014).

I.    **All allegations against Century Park are conclusory and must be dismissed for failure to comply with Rule 9(b).**

The first mention of Century Park in the second amended complaint's substantive allegations of fraud does not come until paragraph 82 (of 90). In paragraph 82, relators allege that "[o]n or around July 31, 2018, Century Park purchased [DCDT]." 2nd Am. Compl., ECF No. 77-1, ¶ 82. No details of the nature of the transaction are alleged. Relators next allege that "[p]rior to Century Park acquiring [DCDT], Century Park did an in-depth review and analysis of [DCDT]'s operations, including its TDT services." Id. ¶ 83. Relators allege, "After acquiring [DCDT], Century Park installed its persons, GL Pullam, Part Owner, and Dr. Peter Zucker, a clinical professional, as Executive Chairman of the Board of Directors." Id. ¶ 84. However,

relators do not allege how these individuals or anyone else at Century Park might have become aware of DCDT's fraudulent activities, what they might have known, or how they facilitated any ongoing fraud in the twilight days of DCDT's TDT program, which was discontinued 16 months after Century Park acquired DCDT. Id. ¶¶ 87-90. Relators conclusorily assert that Century Park became more than an owner, acting instead as a "'partner' of [DCDT], taking an active role in managing and operating [DCDT]'s business to, in Century Park's words, 'implement operational process improvements.'" Id. ¶ 85. Even accepting this allegation as true, however, relators have failed to forge any connection between Century Park's alleged active role in operating DCDT and fraud. Id. ¶ 85.

The allegations regarding Century Park's involvement with the false claims are conclusory. Relators allege that "Century Park became aware of the massive Medicaid fraud that [DCDT] was perpetrating," id. ¶ 86, "did nothing to correct [DCDT]'s continued fraud until the TDT program was shut down, id. ¶ 87, and "allowed [DCDT] and DYS to keep the ill-gotten Medicaid proceeds from the TDT program rather than refund Medicaid for those proceeds as it was obligated to do so," id. ¶ 89. These scant allegations fall far short of what is required under Rule 9(b) to state a fraud claim against Century Park.

Moreover, relators fail to allege a conspiracy between DCDT and Century Park under 31 U.S.C. § 3729(a)(1)(C). "To plead a claim for an FCA conspiracy, the relator must allege that the conspirators 'agreed that a false record or statement would have a material effect on the Government's decision to pay a false or fraudulent claim.'" United States ex rel. Ahumada v. NISH, 756 F.3d 268, 280 (4th Cir. 2014) (quoting Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 673 (2008)). "The relator must also allege that each member of the

conspiracy joined the agreement and one or more conspirators knowingly committed at least one overt act in furtherance of the conspiracy." United States ex rel. Miller v. Reckitt Benckiser Grp. PLC, 698 F. Supp. 3d 889, 917 (W.D. Va. 2023) (citing Pencheng Si v. Laogai Research Found., 71 F. Supp. 3d 73, 89 (D.D.C. 2014)). Although relators allege that Century Park became DCDT's "partner," relators have not alleged that an unlawful agreement existed, let alone its scope or any overt acts taken in furtherance of such an agreement. Thus, all claims against Century Park, namely Counts III and IV, must be dismissed.

## II.  Relators' allegations against DCDT based on Scheme One, Scheme Three, Scheme Four, Scheme Five, Scheme Six, and Scheme Eight can be dismissed for failure to comply with Rule 9(b).

As preliminarily indicated by the observations of omissions in the above background summary of the eight alleged schemes, relators' allegations as to Scheme One (Embellished Initial Assessments),  Scheme Three (Fraudulently Retaining Clients Who Should Have Been Discharged), Scheme Four (Fraudulent Individual Service Plans), Scheme Five (False Dating of Documents), Scheme Six (Miscellaneous False Documentation), and Scheme Eight (Miscellaneous Noncompliance with Medicaid Regulations) are each missing at least one if not more of the requisite details as to "who, what, when, where, and how." Wheeler, 127 F.4th at 485.

To satisfy Rule 9(b), FCA relators are generally required to identify the false records underlying their claims and to "specif[y] the contents of Defendant's alleged false claims." United States v. Centra Health, Inc., 724 F. Supp. 3d 549, 564-65 (W.D. Va. 2024); see also Phipps, 2015 WL 2452448, at *7 (dismissing claims where the relator failed to "provide any

specific factual allegations about what fraudulent record or statement Defendants made that caused them to avoid repaying the government, . . . or [such record's] contents"). Here, relators fail to allege the content of any fraudulent records underlying Scheme One (Embellished Initial Assessments), Scheme Three (Fraudulently Retaining Clients Who Should Have Been Discharged), Scheme Four (Fraudulent Individual Service Plans), or Scheme Six (Miscellaneous False Documentation).

As to Scheme One, relators allege that DCDT employees embellished initial assessments to maximize enrollment and to maximize the hours of services for which DCDT could seek reimbursement per client. 2nd Am. Compl., ECF No. 77-1, ¶¶ 55, 57 (d). However, relators fail to describe the content of any initial assessment. Id. Without any details from which to draw a comparison between the behaviors clients exhibited and the behaviors described by the initial assessments, the court cannot surmise that the initial assessments were false, and Scheme One lacks "specific facts that support an inference of fraud." Wilson, 525 F.3d at 379 (quotation omitted).

For Scheme Four as well, although relators allege that ISPs were copy and pasted, rather than drafted afresh by a QMHP-C with knowledge of a given client's case, relators do not allege what information was contained in the ISPs or whether (and in what way) the copy and pasted information was inaccurate. 2nd Am. Compl., ECF No. 77-1, ¶ 63 g. As with Scheme One, without details as to the content of the allegedly fraudulent documentation, the court has before it no alleged facts from which to infer falsity, and Scheme Four cannot survive Rule 9(b).

For largely the same reasons, Scheme Six is not alleged with sufficient detail to satisfy Rule 9(b). Id. ¶¶ 64, 76. Relators assert that fraudulent notes were created by copy and pasting, but because relators do not describe what the notes said and thus do not explain what, if anything, was inaccurate about the notes, these allegations cannot support a false claim.

Scheme Three, which alleges that DCDT retained clients who ought to have been discharged by falsifying clients' behavioral scores, closely resembles claims dismissed in United States v. Centra Health, Inc. for failure to state the content of the alleged false claims. 724 F. Supp. 3d 549. In Centra Health, Inc., the court wrote:

> At a high level, Relators criticize Defendant for "needlessly extending the stays of Medicaid patients while prematurely discharging Anthem patients to maximize revenue." But they do not articulate how Defendant did so. True, Relators complain about doctors "presum[ing] that . . . patients [, who indicated that they might harm themselves at home, actually] had . . . a plan of harming themselves or others." But they do not explain how this presumption is unreasonable, let alone how it generated false claims.

Id. at 565. The Centra Health, Inc. court then noted that FCA liability cannot be based on "'scientific judgments or statements as to which reasonable minds may differ.'" Id. at 566 (quoting United States ex rel. Hill v. Univ. of Med. & Dentistry of New Jersey, 448 F. App'x 314, 316 (3d Cir. 2011)); see also United States ex rel. Milam v. Regents of Univ. of California, 912 F. Supp. 868, 886 (D. Md. 1995) (noting that "[d]isagreements over scientific methodology do not give rise to False Claims Act liability"). Here too, although relators allege at a "high level" that clients were retained who ought to have been discharged based on false behavioral scores, relators do not allege what behaviors clients exhibited that were mischaracterized or why it was unreasonable to retain clients with those behaviors. Centra Health, Inc., 724 F.

Supp. 3d at 565. Even if relators did allege these facts, TDT professionals may disagree as to when clients are too disruptive to be retained or when clients cease benefitting from TDT services. 2nd Am. Compl., ECF No. 77-1, ¶¶ 68-69.

Relators also fail to explain "who" was involved in much of the alleged fraud. See Centra Health, Inc., 724 F. Supp. 3d at 564-65 (dismissing FCA claims for failure to "identif[y] who perpetrated the supposed fraud"). For example, relators frequently state that "QMHP-Cs" created false documentation or conducted inadequate therapeutic sessions, without identifying particular QMHP-Cs. In Centra Health, Inc., the court deemed similar allegations inadequate where "instead of identifying a specific doctor, Relators vaguely point[ed] to '[p]hysicians and other caregivers' as the responsible parties." Id. at 564. Here too, there is a total dearth of allegations as to "who" was involved in Scheme One (Embellished Initial Assessments), Scheme Three (Fraudulently Retaining Clients Who Should Have Been Discharged), Scheme Five (False Dating of Documents), and Scheme Eight (Miscellaneous Noncompliance with Medicaid Regulations).

In addition to failing to identify who perpetrated several of the alleged schemes and to describe the content of the allegedly fraudulent documentation underlying several of the alleged schemes, many of the second amended complaint's allegations lack any details as to "when Defendant's fraud took place." Id. at 565. In Centra Health, Inc., several claims were dismissed because, "instead of identifying the specific timeframe when the fraud allegedly took place, [relators] merely contend[ed] that it occurred 'regularly.'" Id. Here, many of relators' allegations similarly state that fraudulent activity occurred regularly from 2009 through 2019. For example, as to Scheme Five (False Dating of Documents), relators allege that QMHP-Cs

fraudulently backdated ISPs, but they do not state any timeframe in which this occurred. 2nd Am. Compl., ECF No. 77-1, ¶ 67. Relators' allegation in Scheme Eight (Miscellaneous Noncompliance with Medicaid Regulations) that DCDT failed to provide one-hour monthly individual supervisions toQMHP-Cs by licensed clinical supervisors similarly fails to state a relevant timeframe. Id. ¶ 70; see also id. ¶ 71 (failing to allege a timeframe for Scheme Eight's allegation that DCDT did not provide clients who had not yet established a community mental healthcare provider with a mandated once monthly one-hour individual counseling session by a licensed clinical supervisor).

Failure to satisfy Rule 9(b) due to missing details as to the content of false claims, who made false claims, and when false claims were made thus provides an independently sufficient basis for dismissing all but Scheme Two (Fraudulent Billing for Maximum Hours) and Scheme Seven (Anti-Kickback Violations).

**III.    Relators' allegations against DCDT based on Scheme Three, Scheme Four, Scheme Five, Scheme Six, Scheme Seven, and Scheme Eight can also be dismissed on the additional basis of failure to plead the elements of a FCA or VFATA claim.**

Failure to satisfy the elements of an FCA claim provides an additional independent basis to dismiss many of the alleged schemes in this case—importantly, including Scheme Seven (Anti-Kickback violations). See Centra Health, Inc., 724 F. Supp. 3d at 561-64 (dismissing multiple alleged fraudulent schemes for failure "to plead materiality" and for failure "to plead that Defendant presented false claims to the government"). It is unsurprising that examining relators' claims from the perspective of the elements of an FCA claim and from the

perspective of Rule 9(b) produces the same result as these are ultimately two ways of looking at the same requirement—that relators must plead FCA violations with particularity. See, e.g., Wheeler, 127 F.4th at 493 (requiring specific allegations as to the content of false documents, who created false documents, and when false documents were created in order to satisfactorily allege the element of an FCA violation requiring that false claims were actually presented to the government for payment). For example, the lack of allegations as to the content of the allegedly fraudulent documents underlying several of the schemes discussed above leads them to fail under Rule 9(b) and likely also means that relators have failed to allege the first element of an FCA claim, which requires falsity. Harrison II, 352 F.3d at 913. However, rather than reiterating that analysis, this section will focus on the more distinctive ways in which relators' allegations fail to comply with the requirements of an FCA claim.

At least two schemes fail to satisfy the third element of an FCA claim, which requires that "the [false] statement or conduct was material" to a government decision about payment. Harrison II, 352 F.3d at 913. As the Supreme Court explained in Universal Health Services, Inc. v. United States ex rel. Escobar, "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." 579 U.S. 176, 181 (2016). In Escobar, the Court held that "statutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment." Id. at 191. Rather, the FCA itself states that a violation of such a requirement must have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). As the Court clarified, "[p]roof of materiality can include, but is not

necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular . . . requirement . . . . Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, . . . that is strong evidence that the requirements are not material." Id. at 194-95. Applying Escobar, the Fourth Circuit has further characterized the materiality inquiry as "functional, rather than formalistic," in examining "[w]hether a provision is 'so central' that it goes 'to the very essence of the bargain.'" Boyko, 39 F.4th at 190 (citing Escobar, 579 U.S. at 193 n.5, 196).

Here, Scheme Five (False Dating of Documents) and Scheme Eight (Miscellaneous Noncompliance with Medicaid Regulations) fall short of this materiality standard. The following are indeed alleged to constitute violations of Medicaid requirements: (1) falsifying the dates on ISPs and behavior reports, 2nd Am. Compl., ECF No. 77-1, ¶¶ 63 g, 67; (2) duplicating services provided by the schools where DCDT operated, id. ¶ 66; (3) billing for services provided during transportation time, id. ¶¶ 63 d-e; (4) failing to provide monthly supervision by a licensed clinical supervisor to QMHP-Cs, id. ¶ 70; (5) and failing to provide clients who had not yet acquired a community health care provider with a monthly individual counseling session by a licensed clinical supervisor, id. ¶ 71. Relators have also alleged that several of these violated requirements were conditions of payment. See, e.g., id. ¶ 67 (stating that timely signature of ISPs was a condition of payment). However, these alleged violations fall far short of meeting the materiality element of an FCA claim because relators do not assert that a claim for payment would actually be refused on any of these bases. Escobar, 579 U.S. at 194-95. Rather, form date requirements and supervision requirements appear to be ancillary

technicalities, not requirements central to the very essence of the bargain between DCDT and Medicaid. Boyko, 39 F.4th at 190. Even at the pleading stage, this lack of allegations supporting materiality is an independently sufficient justification for dismissal. Escobar, 579 U.S. at 195 n.6 (rejecting the defendant's "assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss or at summary judgment" in light of the heightened Rule 9(b) standard).

Next, relators struggle with the final element of an FCA claim, which requires relators to demonstrate that the alleged fraud "caused the government to pay out money or to forfeit money due." Harrison II, 352 F.3d at 913. "[T]he critical question is whether the defendant caused a false claim to be presented to the government, because liability under the [FCA] attaches only to a claim actually presented to the government for payment, not to the underlying fraudulent scheme." United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 456 (4th Cir. 2013). A relator may establish submission of a false claim in two ways. First, a relator may "allege with particularity that specific false claims actually were presented to the government for payment" by describing "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Wheeler, 127 F.4th at 491 (citations and quotations omitted). Alternatively, a relator can allege "that the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were submitted to the government." Id.

The Fourth Circuit clarified its understanding of the latter method for showing submission of a false claim in its recent decision in United States ex rel. Wheeler v. Acadia Healthcare Co., 127 F.4th 472 (4th Cir. 2025). There, the Fourth Circuit concluded that a

relator had adequately pleaded the submission of false claims by alleging that the defendant facilitated the creation of false therapy notes for therapy that was never provided. 127 F.4th at 493. The relator alleged that false notes were drafted to defraud Medicare, Medicaid, and other government health programs by falsely indicating that the defendant, an addiction treatment provider, was providing therapy in conjunction with its administration of methadone, which was a requirement for receiving government payments. Id. The Fourth Circuit reasoned, "There can be little doubt that, if [defendant] created these false notes, it billed for those services." Id. The court reasoned that it would "stretch the imagination" for such false notes to be created but never used in a submission in accordance with the regular billing track described by the relator. Id. (quoting Nathan, 707 F.3d at 454). The false therapy notes thus fit the paradigm of "fraudulent conduct necessarily le[ading] to the plausible inference that false claims were submitted to the government." Id. at 491. The Wheeler court elucidated that standard as follows: even where a relator "'cannot allege the details of an actually submitted false claim, [the complaint] may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" Id. at 493 (quoting United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)). The relator may thereby "'connect the dots, even if unsupported by precise documentation, between the alleged false claims and government payment.'" Id. (quoting United States ex rel. Grant v. United Airlines Inc., 912 F.3d 190, 199 (4th Cir. 2018)).

Even in light of Wheeler, Scheme Three (Fraudulently Retaining Clients Who Should Have Been Discharged), Scheme Four (Fraudulent Individual Service Plans), Scheme Five

(False Dating of Documents), Scheme Six (Miscellaneous False Documentation), and Scheme Seven (Anti-Kickback Violations) fail to allege submission of false claims to the government for payment.

However, before explaining why this is the case, it is worth foreshadowing that Scheme Two (Fraudulent Billing for Maximum Hours) fits the <u>Wheeler</u> paradigm almost exactly. As was the case with the false therapy notes in <u>Wheeler</u>, it would stretch the imagination to think that the false therapy notes and false attendance sheets in this case were created for sessions that never occurred for a reason other than submitting such documentation to Medicaid to substantiate billing for the hours of services falsely described by those documents. <u>Wheeler</u>, 127 F.4th at 493. Under <u>Wheeler</u>, it does not matter that relators here have not yet produced a document submitted to Medicaid citing false therapy notes and requesting compensation for maximum hours. <u>Id.</u>; <u>see also</u> <u>Grant</u>, 912 F.3d at 199 (noting that an FCA relator need not "produce documentation or invoices at the outset of the suit" or have "specific knowledge of a company's financial and billing structure"). Instead, it is enough at this stage that relators have alleged the who, what, when, where, and how of the specific conduct comprising Scheme Two and connected that scheme to allegations that Medicaid's general system of payment relied on therapy notes and attendance sheets to determine the portion of prepayments TDT programs like DCDT were justified in retaining. <u>See</u>, <u>e.g.</u>, 2nd Am. Compl., ECF No. 77-1, ¶ 65 (describing the who, what, when, where, and how of an incident in which QMHP-C L.C. drafted 50 fictitious treatment notes for a one month period in 2018-2019 for services that were never provided and explaining that "[t]he documentation of the fictitious treatments for

these claims were then put into the Lauris claims processing system, and [DCDT] billed Medicaid").

Setting Scheme Two to the side again for now, many of relators' other allegations lack sufficient details to ground a logical link between alleged fraudulent activity and submission of claims for payment. Although <u>Wheeler</u> illuminates the scope of the latitude courts in the Fourth Circuit are to afford FCA relators in relying upon logical connections between a scheme to create false documents and a scheme to submit those documents, <u>Wheeler</u> did not relax the requirement that relators must allege the fraudulent scheme itself with "particular details"—a requirement that overlaps with Rule 9(b). <u>Id.</u> at 493. In <u>Wheeler</u>, the court specifically noted that the relator had alleged "specific services recorded but never provided," with details such as "examples of false therapy notes that were repeatedly used to falsify patient records," the identities of staff "who created and signed the notes," the "dates and descriptions of the fictitious therapy sessions," and the details as to how the defendant was directly reimbursed by the government. <u>Wheeler</u>, 127 F.4th at 493. The lack of similarly detailed allegations here, except as to Scheme Two, makes this case distinguishable.

In contrast to Scheme Two's allegations of receipt of payments for TDT services not provided, relators have not alleged such details concerning the following schemes: Scheme Three (Fraudulently Retaining Clients Who Should Have Been Discharged), <u>id.</u> ¶ 68-69 (failing to allege which, if any, QMHP-Cs actually followed an instruction to record inaccurate behavioral scores so as to retain clients in the TDT program and, if they did, how such scores were inaccurate or how an accurate score would trigger discharge); Scheme Four (Fraudulent Individual Service Plans), <u>id.</u> ¶ 63 g (failing to allege anything about how ISPs are used to seek

41

payment and whether the copy and pasted ISPs or misdated ISPs were both false and material to the payment of a false claim); Scheme Five (False Dating of Documents), id. ¶ 67 (failing to allege that QMHP-Cs complied with the directive to falsely date documents and failing, if any did, to identify those QMHP-Cs and whether such false dating was material); Scheme Six (Miscellaneous False Documentation), id. ¶ 76 (alleging that DCDT instructed employees to copy and paste descriptions of interventions in an attempt to resubmit claims to Medicaid, but not alleging what information was to be copied and pasted, whether that information was false or material, or whether any employees in fact complied by resubmitting a copied and pasted document to Medicaid); Scheme Eight (Miscellaneous Noncompliance with Medicaid Regulations), id. ¶¶ 66,70, 71, 63 d-e (failing to allege the false claims arising from myriad allegations concerning duplication of services, lack of QMHP-C monthly supervision, lack of individual counseling services for clients who did not have a community health provider, or billing for transportation time).[10] Accordingly, Scheme Three, Scheme Four, Scheme Five, Scheme Six, and Scheme Eight fail to allege that false claims were necessarily submitted to the government, let alone identify specific documents that were submitted for payment.

Scheme Seven can also be dismissed for this reason. Scheme Seven concerns FCA claims stemming from violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b,

---

[10] The omission of Scheme One (Embellished Initial Assessments) from this analysis should not be taken as an indication that the court believes this scheme satisfies the requirement that an FCA claim be based on a false claim actually submitted to the government. Scheme One may come closer than Scheme Three, Scheme Four, Scheme Five, Scheme Six, Scheme Seven, and Scheme Eight. For example, as regards Scheme One, relators do plead that initial assessments are directly submitted to Medicaid so as to calculate prepayment amounts, 2nd Am. Compl., ECF No. 77-1, ¶ 57 (a). However, the allegations of Scheme One fall far short of the particularity requirement of Rule 9(b). This lack of necessary details also means that even if relators have alleged a logical link to a submission to the government, they have not alleged sufficient details to satisfy scrutiny under Wheeler. 127 F.4th at 493. Because Rule 9(b) provides an independently sufficient justification for dismissal of Scheme One, there is no need to go further and resolve somewhat closer questions about the elements of an FCA claim.

and its state equivalent, Va. Code Ann. § 32.1-315(B). The federal Anti-Kickback Statute and its Virginia equivalent make it a felony to "knowingly and willfully offer[] or pay[] any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any . . . service for which payment may be made in whole or in part under a Federal healthcare program." 42 U.S.C. § 1320a-7b(b)(2)(A); <u>see also</u> Va. Code Ann. § 32.1-315(B) (classifying identical conduct as a class 6 felony in Virginia). A violation of the Anti-Kickback Statute "automatically constitutes a false claim under the False Claims Act." <u>United States ex rel. Lutz v. Mallory</u>, 988 F.3d 730, 741 (4th Cir. 2021); <u>see</u> 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."). However, importantly, relators must still satisfy the requirement that "all False Claims Act claims must be linked in some way to presenting a claim for payment to the government." <u>Nicholson</u>, 42 F.4th at 194-95.

Here, relators fail to connect the alleged kickbacks to any submission of false claims to the government. Relators allege that relator Fields delivered gifts of basketball shoes to two local high schools with the intent to influence the schools to send DCDT TDT referrals. 2nd Am. Compl., ECF No. 77-1, ¶ 79. Relators also allege that DCDT paid Caroline County School $2,100 with the goal of influencing the school to refer TDT clients. <u>Id.</u> ¶ 80. However, relators do not allege that any referrals actually resulted from these gifts. Without knowing whether any individual ever became a DCDT client who would not otherwise have become a DCDT client, it cannot be inferred that these gifts "caused the government to pay out money or to forfeit money due." <u>Harrison II</u>, 352 F.3d at 913. This case is therefore like <u>United States</u>

ex rel. Nicholson v. MedCom Carolinas, Inc., 42 F.4th 185 (4th Cir. 2022). There, a relator alleged that the defendant paid kickbacks to independent contractors to promote the defendant's services and secure referrals. Id. at 190. The Fourth Circuit noted that "while [the relator's complaint contained] discussion of some payment, there is no discussion of the most important detail: a submitted false claim." Id. at 194-95. Here too, while the complaint specifically identifies payments in the form of basketball shoes and the $2,100 paid to Caroline County School, "there is no discussion of the most important detail: a submitted false claim." Id.

Scheme Seven's allegations concerning "Dominion Dollars" also must be dismissed. Relators allege that gift cards awarded ostensibly to encourage good behavior had the effect of paying clients to remain in the program. 2nd Am. Compl., ECF No. 77-1, ¶ 78 (alleging clients were paid in sums ranging from $12 to $178). Although relators do allege details as to this scheme such as that Fields personally observed this program taking place, its general timeframe, and the initials of students who received "Dominion Dollars," the complaint does not explain whether any of these students would otherwise have left the program. Without describing the circumstances under which any client remained in the program because of "Dominion Dollars," relators cannot point to any claim for payment that was submitted to Medicaid because of "Dominion Dollars." Thus, Scheme Seven can be dismissed alongside Scheme One, Scheme Three, Scheme Four, Scheme Five, Scheme Six, and Scheme Eight. Only Scheme Two remains.

### IV.    Scheme Two satisfies Rule 9(b).

In Scheme Two, relators allege that DCDT sought compensation for more hours of services than DCDT actually provided, including for services never provided at all, by, among other things, falsifying attendance sheets and notes for therapy sessions that never occurred. Although some of the individual allegations as to Scheme Two lack the detail required by Rule 9(b), the specific examples of fraud enumerated below ground the scheme as a whole. These examples give the court confidence that permitting this case to proceed will not lead to a "frivolous" "fishing expedition [],"  causing unnecessary harm to "defendants' reputations." Nicholson, 42 F.4th at 195 (explaining the purpose of Rule 9(b)).

The following paragraphs of the second amended complaint satisfy Rule 9(b) by showing "the who, what, when, where, and how" of Scheme Two. Wheeler, 127 F.4th at 485. Although these may not be the only allegations as to Scheme Two compliant with Rule 9(b) in relators' second amended complaint, these allegations provide the strongest justification for permitting Scheme Two to survive the motion to dismiss.

- Relators allege that, on November 12, 2012 (when), "QMHP-C Goodman" (who) of Westside Elementary (where) submitted "reports" billing five hours for each of five clients (what), thereby seeking compensation from Medicaid for 25 hours of services in a 6.5-hour school day (how). 2nd Am. Compl., ECF No. 77-1, ¶ 58 (1).

- Relators similarly allege that, on January 7, 2013 (when), "QMHP-C Hunter" (who) of James Madison Middle School (where) submitted "reports" (what) totaling 20 hours of billed services in a 6.5-hour school day (how). Id. ¶ 58 (2).

- Relators allege that "QMHP-C Mr. Hash" (who) of Lucy Addison Middle School (where) submitted an attendance sheet (what) on February 4, 2013 (when) that reflected that he provided five hours of services to four clients for a total of 20 hours of services in a single 6.5-hour school day (how). Id. ¶ 56.

- Relators similarly allege that "QMHP-C Ms. Johnson" (who) of Lucy Addison Middle School (where) allegedly reported 18 hours of services in a single 6.5-hour school day (how) on her attendance sheet (what) for February 4, 2013 (when). Id.

- Relators allege that, on February 24, 2014 (when), "QMHP-C Hicks" (who) of Westside Elementary School (where) submitted "reports" (what) billing five hours for each of five clients, totaling an unlikely 25 hours of services in a 6.5-hour school day (how). Id. ¶ 58 (3).

- In Exhibit 1, relators indicate that Johnson and Hash (who) submitted mathematically impossible attendance sheets (what and how) for clients at Lucy Addison Middle School (where) on a series of other dates in 2012 (when). Ex. 1, ECF No. 27-1 at 1-11.

- In Exhibit 1, the same information (what, how, and when) is provided as to Goodman and Hicks (who) at Westside Elementary (where). Id. at 12.

- Relators allege that relator Fields (who) himself served 13 clients while serving as a Senior Lead Counselor [at Ruffner Middle School in Roanoke (where)] and billed the maximum five hours per day for each child, leading him to bill for an impossible 65 hours in a single day (how). 2nd Am. Compl., ECF No. 77-1, ¶¶ 45, 56. He then "fraudulently prepared the necessary TDT daily progress notes" (what). Id. Although this allegation does not state when Fields engaged in this fraudulent conduct, it

46

presumably occurred in 2009 or 2010 (when), as the complaint elsewhere states that Fields was a Senior Lead Counselor from 2009 until 2010. Id. ¶ 45.

- Relators allege that Program Director Dupree (who) [of the "[m]anagement team for the Roanoke—TDT office operating in Franklin County Schools (where)], at the encouragement of Director Keys (who), altered the attendance hours in QMHP-C reports (what) to support payment for maximum hours before submitting the reports to Medicaid (how) in the Spring of 2019 and from August 1 through October 8, 2019 (when). Id. ¶¶ 47 b, 73.

Additionally, relators provide the following examples of occasions on which false treatment notes were drafted and used to support submissions to Medicaid.

- Relators allege, "During December 2018 through approximately May 2019 (when), QMHP-C L.C. (who) [at Benjamin Franklin Middle School (where)] reported to Director Meaghan Keys that during her one-month medical leave (when)[,] . . . every one of her clients [including three identified by initials] were marked absent, when in fact they were present. . . . It was discovered . . . that Program Coordinator David Southall had marked all the clients absent and that no treatment was provided to any of her clients during this one-month period. Director Key's (who) then instructed the QMHP-C [L.C.] (who) to prepare approximately 50 fictitious treatment notes for those clients that included two fictitious daily interventions for each of these clients (what). The documentation of the fictitious treatments for these claims were then put into the Lauris claims processing system, and [DCDT] billed Medicaid for the fictitious therapeutic services to those clients that were not delivered (how)." Id. ¶ 65.

- Relators allege that they themselves (who and where) prepared "fictitious documentation" including "daily therapeutic notes for clients [specifically, 17 clients listed by initials in the second amended complaint] with whom they had never worked" (what) "[d]uring the 2018 Summer Program" (when) "in order to support their submission to Medicaid for the maximum billable hours" (how). Id. ¶ 63 h.[11]

- Relators allege that DCDT was required to provide a minimum of two hours of individual therapeutic sessions but did not do so (what). Relators identify specific students at Lee Ward Elementary School, Benjamin Franklin Middle School, and Ruffner Middle School (who and where) "for which Dominion received advanced payment and then falsely recorded they provided services that were not rendered" (how). Id. ¶ 62 b.

As the Fourth Circuit has noted, "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Harrison I, 176 F.3d at 784. Here, particularly in light of the dismissal of relators' ancillary allegations, the court is satisfied that DCDT has been given notice of the particular circumstances underlying Scheme Two, permitting DCDT to prepare a defense focused on those specific allegations without the distraction of the inadequately pleaded aspects of relators' second amended complaint. The

---

[11] It is worth noting that this is perhaps the only one of relators' allegations specifically pertaining to the summer program that satisfies Rule 9(b). However, while the second amended complaint makes the arbitrary drafting choice to disaggregate relators' allegations about the summer program from their allegations about the school year, the court will treat all allegations about fraudulent maximum billing based on falsified attendance sheets and treatment notes, whether dated during the school year or summer program, as part of Scheme Two.

court is also satisfied that relators' Scheme Two allegations are rooted in prediscovery evidence. Accordingly, relators' Scheme Two allegations cannot be dismissed under Rule 9(b).

### V.    Scheme Two states an FCA and VFATA claim.

In addition to satisfying Rule 9(b), Scheme Two satisfies the elements of an FCA or VFATA claim. First, relators' Scheme Two allegations plausibly indicate "that [DCDT] made a false statement or engaged in a fraudulent course of conduct." Harrison II, 352 F.3d at 913. Relators have demonstrated the inherent falsity of attendance sheets indicating mathematically impossible hours of services, even without describing the other content contained in an attendance sheet. Lack of detail as to the content of fraudulent documentation was fatal to several of relators' other claims because, without content, the court was unable to evaluate whether an initial assessment or behavioral report was false and material. Scheme Two is distinct because the truth or falsity of a claim that an hour of services was provided is simply binary. Thus, although relators have not alleged much more than the number of hours reported on attendance sheets, this is enough detail from which to glean falsity. The same logic applies to relators' allegations concerning fictitious treatment notes for services which were never provided. Although relators have not described the fake details recorded in those notes, such content is irrelevant because notes for services that were not provided are inevitably false simply because they indicate that services were provided when they were not.

Second, the allegations here suffice to show "the requisite scienter." Harrison II, 352 F.3d at 913. Under the FCA, a defendant "acts with the requisite scienter if they (1) have actual knowledge of the falsity of the information; (2) act in deliberate ignorance of the truth or falsity of the information; or (3) act in reckless disregard of the truth or falsity of the

information." Boyko, 39 F.4th at 197 (citing 31 U.S.C. § 3729(b)(1)(A)) (quotation omitted). "No proof of specific intent to defraud is required." Id. (citing 31 U.S.C. § 3729(b)(1)(B)) (quotation omitted). Here, QMHP-Cs would inevitably know if they reported more hours of services than they actually provided, particularly where the hours they claimed far exceeded what it would be humanly possible to provide. Additionally, relators specifically allege that relator Fields knew he was falsely representing the hours of services he provided, 2nd Am. Compl., ECF No. 77-1, ¶ 56, and relators specifically allege that QMHP-C L.C. knew that no QMHP-C had provided services to her clients during the month for which she drafted fictitious notes, id. ¶ 65.

Third, the false statements underlying Scheme Two are plainly material. Harrison II, 352 F.3d at 913. Relators allege that "attendance reports are essential for the Billing Compliance Review to track Medicaid-covered services throughout the year to ensure compliance with the interim billing requirements for each eligible student receiving prescribed Medicaid covered services." 2nd Am. Compl., ECF No. 77-1, ¶ 49 c (c). Because payment is only to be provided for services actually rendered and in proportion to the hours of services actually rendered, attendance sheets reporting hours of services and notes of therapy sessions purporting to substantiate that those therapy sessions occurred are "'so central'" that they go "'to the very essence of the bargain'" between DCDT and Medicaid. Boyko, 39 F.4th at 190 (citing Escobar, 579 U.S. at 193 n.5, 196).

Finally, relators have shown that false attendance sheets and other documentation supporting billing for maximum hours "caused the government to pay out money or to forfeit money due." Harrison II, 352 F.3d at 913. Admittedly, relators have not provided any

examples of actual documents submitted to Medicaid containing fraudulent attendance sheets or therapy notes, but such "precise documentation" is not required. Wheeler, 127 F.4th at 493 (quotation omitted). Like the relator in Wheeler, 127 F.4th at 493 (noting that the relator described the system of direct reimbursement at issue), these relators have explained the typical role played in the Medicaid billing process by attendance sheets and therapy notes, 2nd Am. Compl., ECF No. 77-1, ¶ 49 c (c). And, for the reasons already explained in concluding that Scheme Two satisfies Rule 9(b), relators have alleged the fraudulent scheme itself with details similar to those provided in Wheeler, such as "who created and signed the notes [and attendance sheets]" and the "dates and descriptions of the fictitious therapy sessions." 127 F.4th at 493. The second amended complaint thus makes it possible to "connect the dots" between, on the one hand, the alleged scheme to create attendance sheets and therapy notes falsely claiming that DCDT provided maximum billable hours of services and, on the other hand, the alleged significance of attendance sheets and therapy notes in Medicaid's general payment system for determining the share of prepayments TDT programs like DCDT were justified in retaining. As in Wheeler, "[t]here can be little doubt that, if [DCDT] created these false notes," claiming to have provided hours of services that were never provided, "it billed for those [hours of] services." 127 F.4th at 493. Thus, Scheme Two states a claim under the FCA and VFATA.

## VI.    Scheme Two alleges a state-wide conspiracy.

Moreover, relators' well-pleaded FCA and VFATA claims under Scheme Two can proceed on a state-wide basis. Defendants argue that relators have failed to demonstrate that the examples of fraud they allege, largely in Rocky Mount and Roanoke, are indicative of

DCDT's activities across Virginia. Mem. Supp. Mot. Dismiss, ECF No. 55 at 13-17. And indeed, relators are all based in either Rocky Mount or Roanoke, and most of the facts alleged do concern those locations. 2nd Am. Compl., ECF No. 77-1, ¶¶ 43-45, 62 b. However, relator Fields held a state-wide position as State Director of Business Development from May 2017 until August 2018. Id. ¶ 45. In this position, Fields would travel to offices around the state "to promote and provide incentives to make certain that [DCDT's] numbers were up and staff was billing for the maximum hours." Id. ¶ 49 a. On this basis, relators allege knowledge that billing for maximum hours, rather than actual hours, "was a statewide billing practice, not just in Roanoke and Franklin County." Id. ¶ 54. These allegations combined with the detailed local examples of fraud already described satisfy the Fourth Circuit's standard for state-wide FCA claims. Under Wheeler, a state-wide scheme can be alleged by pleading, first, that a relator personally observed specific local fraud and, second, that the relator had a basis for learning that similar activities were being duplicated state-wide. 127 F.4th at 488.

In Wheeler itself, the relator's allegations "predominantly" concerned a single clinic in Asheville; however, the Fourth Circuit concluded that the relator successfully alleged a state-wide scheme by further alleging "that the Medical Director of the North Wilkesboro, North Carolina clinic informed her that group therapy notes were similarly falsified at that clinic;" that "the Clinic Director of the Asheville facility informed her that the fraudulent group therapy notes were being created 'at other North Carolina locations,' including the clinics in Pinehurst and Fayetteville;" and that when the relator complained about the alleged fraud, "the manager responsible for Acadia's North Carolina oversight told [relator] to 'stay in her lane.'" Id. Here, relator Fields has perhaps a firmer basis for alleging state-wide fraud than the

second-hand information relied upon in Wheeler because he was personally privy to billing practices throughout Virginia. And although the allegations that fraudulent billing practices extended state-wide in this case lack certain details, for example, as to which QMHP-Cs at other locations recorded maximum hours, 2nd Am. Compl., ECF No. 77-1, ¶ 46, the hearsay-based assertions in Wheeler were similarly broad in alleging only generally that fraudulent group therapy notes were being created at "'other North Carolina locations,'" such as Pinehurst, Fayetteville, and Wilkesboro, 127 F.4th at 488. Thus, Wheeler permits state-wide fraud to be alleged by combining specific local allegations with more general assertions of state-wide fraud, where supported by an explanation as to how a relator learned of the state-wide fraud. Relator Fields' assertions here satisfy that standard.

### VII.    Scheme Two cannot be dismissed solely on statute of limitations grounds at this stage.

Finally, defendants ask the court to dismiss on the basis of the statute of limitations. Mem. Supp. Mot. Dismiss, ECF No. 55 at 30-31. Defendants' point is well taken that some, or perhaps many, of the allegations in this case are old—dating back to 2009—and may well be time-barred. However, the court cannot dismiss on this basis at this stage because factual questions remain in determining which statute of limitations applies. See Semenova v. Md. Transit Admin., 845 F.3d 564, 567 (4th Cir. 2017) (noting that a motion to dismiss should only be granted on statute of limitations grounds "if the time bar is apparent on the face of the complaint") (quotation omitted).

The FCA provides that a civil action under 31 U.S.C. § 3730 "may not be brought—(1) more than 6 years after the date on which the violation . . . is committed, or (2) more than 3

years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last." 31 U.S.C. § 3731(b); see also Va. Code Ann. § 8.01-216.9 (providing for the same alternative provisions in the VFATA). In other words, the six-year statute of limitations running from the date of the false claim violation may be extended by a three-year discovery rule, capped at ten years after the violation.

After the Supreme Court's decision in Cochise Consultancy, Inc. v. United States ex rel. Hunt, regardless of whether the government intervenes, either the six-year statute of limitations or the three-year discovery rule may apply in a relator-initiated FCA suit, and the difference hinges on when the government official charged with responsibility to act obtained knowledge of the relevant facts. 587 U.S. 262, 271 (2019).[12] In this case, whether and when the government knew or should have known about Scheme Two cannot be discerned on the face of the second amended complaint, precluding application of the six-year statute of limitations across the board at this stage.

Moreover, at least some of the allegations as to Scheme Two appear to survive application of the six-year post-violation statute of limitations. Relators filed their first complaint on July 22, 2021. ECF No. 1. Thus, although the six-year statute of limitations would bar claims based on violations predating July 22, 2015, such as the allegations

---

[12] Prior to the Supreme Court's decision in Cochise Consultancy, Inc., the Fourth Circuit applied the six-year limitations period to relator-initiated, non-intervened suits and the alternative provision to suits involving the United States. United States ex rel. Sanders v. N. Am. Bus Indus., Inc., 546 F.3d 288, 293 (4th Cir. 2008) ("We hold that Section 3731(b)(2) extends the FCA's statute of limitations beyond six years only in cases in which the United States is a party.").

concerning false attendance sheets submitted in 2012, 2013, and 2014, see 2nd Am. Compl., ECF No. 77-1, ¶¶ 56, 58, the six-year statute of limitations would not bar relators' claims based on events in 2018 and 2019, such as Program Director Dupree's falsification of QMHP-C drafted attendance sheets in 2019, id. ¶ 73, QMHP-C L.C.'s creation of 50 fictitious treatment notes in 2018-2019, id. ¶ 65, or relators' own submission of false therapeutic notes during the 2018 summer program, id. ¶ 63 h.[13] And if the three-year discovery rule applies, then even claims based on violations before July 22, 2015, but after July 22, 2011, may be saved—such as those based on the 2012, 2013, and 2014 attendance sheets. Given the necessary factual development required to ascertain the applicability of the three-year discovery rule, it would be premature to dismiss false claim allegations during that period on statute of limitations grounds at this time.

That said, it is clear that certain of the false claim violations alleged in the second amended complaint, i.e., those occurring before July 22, 2011, are time barred as they arose more than ten years before the filing of the original complaint on July 22, 2021. Thus, such

---

[13] The relevant "violation" does not occur on the date on which the fraudulent document was drafted or on the date to which the fraudulent document pertains, which are the bases for most of the dates in the second amended complaint. Although the Fourth Circuit has not expressly defined what constitutes a "violation" triggering the FCA statute of limitations period, courts in this circuit have found that the relevant violation occurs upon the submission of a false claim, though some circuits rely on the date of payment. See United States ex rel. Fadlalla v. DynCorp Int'l LLC, 402 F. Supp. 3d 162, 194 (D. Md. 2019) (citing United States ex rel. Dugan v. ADT Sec. Servs., Inc., No. 2003-3485, 2009 WL 3232080, at *4 (D. Md. Sept. 29, 2009)); see also United States v. Rivera, 55 F.3d 703, 707 (1st Cir. 1995). But see United States ex rel. Grupp v. DHL Exp. (USA), Inc., 47 F. Supp. 3d 171, 179 (W.D.N.Y. 2014), aff'd sub nom., United States ex rel. Grupp v. DHL Worldwide Exp., Inc., 604 F. App'x 40 (2d Cir. 2015) ("The FCA's six-year statute of limitations begins to run 'on the date the claim is made, or, if the claim is paid, on the date of payment.'" (quoting United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993))). Regardless, it is safe to assume that the relevant submissions (or payments) occurred in this case soon after the dates relators allege. Moreover, it is irrelevant that Scheme Two as a whole allegedly began in 2009, outside any potentially applicable statute of limitations period, because the running of the statute of limitations is tied to each new "violation" occurring upon the submission of a new claim (or receipt of a new payment).

violations, like the alleged submission by relator Fields of a false attendance sheet in 2009 or 2010, id. ¶ 56, may not be the basis of relators' Scheme Two claims going forward. Thus, even at this stage, the motion to dismiss may be granted on statute of limitations grounds as to any alleged false claim violations occurring before July 22, 2011.

While the specific dates of DCDT's failure to provide the minimum two hours of individual therapeutic services are not alleged, the second amended complaint flatly alleges that DCDT "failed, for nearly every client, to provide the mandated minimum of 2 hours of individual therapeutic services." Id. ¶ 62 b. As a result, the court cannot at this stage dismiss this aspect of Scheme Two on statute of limitations grounds. This defense will be reassessed at the summary judgment stage.

## CONCLUSION

Thus, having **GRANTED** relators' motion to amend, the court hereby **GRANTS in part** and **DENIES in part** defendants' motion to dismiss, as follows:

(1) The motion to dismiss is **GRANTED** as to all allegations of false claim violations occurring prior to July 22, 2011.

(2) The motion to dismiss Counts I and II is **DENIED** regarding the false claims allegations comprising Scheme Two—concerning false claims for TDT services not provided by DCDT and for hours of services exceeding those actually provided by DCDT, as alleged in paragraphs 49(c), 49(d), 49(e), 51-54, 56, 57(f), 58, 59(part), 62(b), 62(c), 62(a)(second), 63(a), 63(b), 63(c), 63(f), 63(h), 65, 73, and 77 of the second amended complaint.

(3) The motion to dismiss Counts I and II is **GRANTED** regarding the false claim allegations comprising Schemes One, Three, Four, Five, Six, Seven, and Eight of the second amended complaint.

(4) The motion to dismiss is **GRANTED** as to Counts III and IV of the second amended complaint. Accordingly, Century Park is dismissed as a defendant in this case.

An appropriate order will be entered.

Entered: July 15, 2025

Michael F. Urbanski
Senior United States District Judge