CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
October 26, 2026
LAURA A. AUSTIN, CLERK
BY: /s/L. Ayers
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., COMMONWEALTH OF VIRGINIA, ex rel., ALEXANDRA CROCKETT KEENEY GILE, as Executor of the Estate of Diane Crockett, BARRY GRAY-COUCH, and MARVIN FIELDS, JR., | ) |
| Plaintiffs, | ) Civil Action No. 7:21-cv-00420 |
| v. | ) By: Elizabeth K. Dillon, Chief United States District Judge |
| DOMINION CARE DAY TREATMENT, LLC, | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

Qui tam relators Alexandra Crocket Kenney Gile, as executor of the estate of Diane Crockett, Barry Gray-Couch, and Marvin Fields, Jr. (collectively, relators)[1] allege that Century Park Capital Partners, LLC (Century Park) and Dominion Care Day Treatment, LLC (DCDT) violated the False Claims Act (FCA), 31 U.S.C. §§ 3729–33, and the Virginia Fraud Against Taxpayers Act (VFATA), Va. Code § 8.01-216, *et seq.*, by submitting false claims to Medicaid. (Second Am. Compl., Dkt. No. 77-1.) The United States and the Commonwealth of Virginia declined to intervene. (Dkt. Nos. 10, 12, 42, 43.) Previously, the court partially granted defendants' motion to dismiss and dismissed all claims against Century Park, the private equity firm that acquired DCDT on or around July 31, 2018. (Dkt. No. 89; Second Am. Compl. ¶ 4.)

[1] The original complaint was filed by relators Diane Crockett and Barry Gray-Couch. (Dkt. No. 1.) The operative second amended complaint—which relators now seek to amend—lists as relators the above-named individuals. (Dkt. No. 77-1.) Because precisely who the relators are is immaterial to the court's resolution of the current motion to amend, the court only discusses the presently named relators throughout this opinion.

This matter is now before the court on relators' motion for leave to file a third amended complaint in which they seek to reinstate Century Park as a defendant. (Dkt. No. 131.)

I. BACKGROUND

**A. Procedural Background**

In July 2021, relators filed a sealed complaint alleging that Century Park, DYS Holding Company, Inc., f/n/a Dominion Youth Services, Inc. (DYS), and DCDT[2] violated the FCA and the VFATA by submitting false claims to Medicaid in the course of providing youth behavioral and mental health services (original complaint). (Original Compl., Dkt. No. 1.) The United States and the Commonwealth of Virginia declined intervention. (Dkt. Nos. 10, 12.)

Thereafter, the three defendants named in the original complaint moved to dismiss the case. (Dkt. No. 20.) Before filing a response to the motion to dismiss, relators filed an amended complaint under seal (first amended complaint). (First Am. Compl., Dkt. No. 27.) The United States and the Commonwealth of Virginia again declined to intervene. (Dkt. Nos. 42, 43.) The parties then stipulated to the dismissal of one of the original defendants, DYS. (Dkt. No. 51.)

The remaining defendants, Century Park and DCDT, again moved to dismiss. (Dkt. No. 54.) In April 2025, a hearing was held on the motion before the Honorable Michael F. Urbanski. (Dkt. No. 75.) Subsequently, relators filed an opposed motion for leave to amend their complaint a second time (second amended complaint). (Dkt. Nos. 77, 80.)

On July 16, 2025, Judge Urbanski issued a memorandum opinion ruling on Century Park and DCDT's motion to dismiss and relators' motion to amend. (Mem. Op., Dkt. No. 88.) As to

[2] DCDT was not named as a defendant in the original complaint. Instead, relators initially named Dominion Youth Services Day Treatment, LLC, d/b/a Dominion Youth Services as a defendant. (Dkt. No. 1.) In their first amended complaint, relators removed Dominion Youth Services as a defendant, replacing it with Dominion Care Treatment, LLC, f/n/a Dominion Youth Services Day Treatment, LLC, d/b/a Dominion Youth Services. (Dkt. No. 27.) In the second amended complaint, Dominion Care Treatment was replaced with DCDT. (Dkt. No. 77-1.) Because the evolution of the named Dominion defendant is immaterial to the resolution of the current motion, the court only references DCDT as a defendant throughout this opinion.

the motion to amend, the court noted that the second amended complaint was identical in substance to the first amended complaint and that relators sought the same damages in both iterations. (*Id.* at 21–22.) The court then granted relators' motion to amend. (*Id.* at 23.) Because the second amended complaint did not cure the deficiencies identified by Century Park and DCDT in their motion to dismiss, the court proceeded to apply the motion to dismiss to the second amended complaint. (*Id.* at 23–26.)

The court distilled relators' claims into eight schemes. (*Id.* at 5–21.) Critical to the court's resolution of the pending motion to amend is scheme two. (*See id.* at 7–13.) Scheme two concerns DCDT's delivery of therapeutic day treatment (TDT) services, which are "structured therapeutic interventions for children with extreme behavioral problems[.]" (*Id.* at 3 (quoting Second Am. Compl. ¶ 36).) "TDT services include medication, education and management, practice using interpersonal skills, and individual, group, and family counseling." (*Id.* (citing Second Am. Compl. ¶ 36).) The court summarized scheme two as follows:

> In sum, Scheme Two alleges that DCDT collected payments from Medicaid for TDT services that were not provided. In various paragraphs of the second amended complaint, relators allege that DCDT made false claims seeking Medicaid payments based on the maximum hours that could be billed for a TDT program participant, despite providing fewer hours of actual TDT services.

(*Id.* at 13.) The court allowed these allegations against DCDT to proceed but limited the claims temporally to only alleged FCA violations before July 22, 2011. (*Id.* at 13, 45–56.) Yet the court dismissed all of relators' claims against Century Park (Counts III and IV). With regard to Count III, the court explained that "relators allege that [Century Park] ha[s] violated the FCA in four ways: presenting false claims to Medicaid, creating false records material to false claims, conspiring to commit these violations, and creating false records material to obligations to pay Medicaid (reverse false claims)." (*Id.* at 27–28.) Because the VFATA is "practically

identical" to the FCA, the court analyzed Count IV, alleging that Century Park violated the VFATA, with Count III. (*Id.* at 29 (quoting *United States ex rel. Donohue v. Carranza*, No. 1:22-cv-189, 2022 WL 3226191, at *8 n.6 (E.D. Va. July 1, 2022)).) Ultimately, the court concluded that "[a]ll allegations against Century Park are conclusory and must be dismissed for failure to comply with Rule 9(b)." (*Id.*)

**B. Proposed Third Amended Complaint**

On April 14, 2026, relators filed a motion for leave to file a third amended complaint (third amended complaint). (Dkt. No. 131; Third Am. Compl., Dkt. No. 131-1; Br. Supp. Mot. Am., Dkt. No. 132.) DCDT filed an opposition (Opp'n Mot. Am., Dkt. No. 135), and relators filed a reply (Reply, Dkt. No. 136). The motion is now ripe for review.

In their third amended complaint, relators seek to bring Century Park back into the case as a defendant.[3] (*See generally* Third Am. Compl.) In support, relators allege that

> on December 20, 2017, Relator Marvin Fields, who was [DCDT's] statewide director of business development at the time, met with key executives of Century Park, including Chip Roeling [sic] (Century Park's managing partner at the time according to its official website), Guy Zacsepinski, and Peter Zucker (who . . . Century Park on its website identified as Century Park Executive Council Member).

(*Id.* ¶ 106.) At that meeting, "the Century Park executives discussed with Fields his role at [DCDT] and his former role in directing the TDT program, how successful the TDT program was and specifics on how each area was profitable." (*Id.* ¶ 107.) According to relators, Fields

[3] In their third amended complaint, relators continue to list the two false records theories of liability in their FCA claim against Century Park. (Third Am. Compl. ¶ 128 ("Century Park . . . knowingly caused [DCDT] to make or use false records or statements to get [the] false or fraudulent claims paid or approved by the Government . . . and/or . . . knowingly caused [DCDT] to make or use false records or statements material to an obligation to repay the Medicaid monies to the Government that were ill-gotten because of the actions of [DCDT].").) However, relators abandon these theories in briefing and instead focus only on the "causes to be presented" and conspiracy theories of liability. (Br. Supp. Mot. Am.; Reply.) Accordingly, the court only considers those two theories of liability as being pled.

also explained to the Century Park executives "that a key to the high profitability of the TDT program" was that DCDT was overbilling for counselors' time by "billing each client the same hour of time" despite having "up to 5 or 6 clients" during that time period. (*Id.*) Fields also informed the Century Park executives "that the TDT program billing system was so financially successful that the annual gross Medicaid revenues for the Roanoke area schools alone was $7.5 million." (*Id.* ¶ 108.) The Century Park executives then allegedly indicated to Fields "a desire and intent to continue the lucrative TDT program billing practice after" acquiring DCDT. (*Id.* ¶ 109.)

After an "in-depth review and analysis of [DCDT's] operations, including its TDT services," Century Park acquired DCDT, as part of its acquisition of DYS, on or around July 31, 2018. (*Id.* ¶¶ 82, 105.) In its announcement about the acquisition, Century Park allegedly "indicated that it would play an active role in managing the operations of DYS (including [DCDT]) rather than acting as a passive investor." (*Id.* ¶ 111.) After Century Park acquired DYS and DCDT, relator Fields left the company. (*Id.* ¶ 118.) Even so,

> Fields kept in touch with worker, staff and the management team of DYS and [DCDT], including TDT staff David Hagwood, Lataya Allen and Jamie Tribett (Site Supervisor), who indicated to Fields that "New Ownership," i.e., Century Park, was having them continue to bill 6–7 clients per day per counselor with total billable hours far exceeding the total hours in the school day. In other words, to continue the fraudulent Medicaid overbilling in the TDT program.

(*Id.*)

Relators then provide numerous examples of alleged post-acquisition fraudulent overbilling. (*Id.* ¶ 120.) For example, relators allege:

- "On September 13 and 18, 2019, QMHP-C[4] Kimberly Turner, while working at Franklin County High School, billed 5 hours for five children (A., A., H., J.[,] and L.) and 1 hour

[4] QMHP-C stands for Qualified Mental Health Professional-Child and refers to counselors employed by DCDT to deliver TDT services. (*See, e.g.*, Third Am. Compl. ¶ 43.)

for another child (S.) for a total of 26 hours each day, for therapeutic services, which is impossible as there are only 6.5 hours in a single school day. Therefore, each day, at least 4 of the 6 billings were fraudulent on their face since there is no logical way that she rendered 26 hours of service in a 6.5-hour school day." (*Id.* ¶ 120(h).)

- "For each day on September 24, 25, 26, and 27, 2019, QMHP-C Leshnika Childress, while working at The Gereau Center, billed 5 hours for six children (N., M., M., L., D., A.) for a total of 30 hours each day, for therapeutic services, which is impossible as there are only 6.5 hours in a single school day and only 24 hours in a day. Therefore, each day, at least 5 of the 6 billings were fraudulent on their face since there is no logical way that she rendered 30 hours of service in a 6.5-hour school day." (*Id.* ¶ 120(n).)

- "On October 18, 23, and 25, 2019, QMPH-C Love Weah, while working at BGE (Bowling Green Elementary School), billed 5 hours for five children (T., S., M., A., J.) and 3 hours for another child (M.) for a total of 28 hours each day, for therapeutic services, which is impossible as there are only 6.5 hours in a single school day. Therefore, each day, at least 5 of the 6 billings were fraudulent on their face since there is no logical way that she rendered 28 hours of service in a 6.5-hour school day." (*Id.* ¶ 120(t).)

- "On September 6, 2019, QMPH-C [(and relator)] Barry Gray-Couch, while working at Benjamin Franklin Middle School, billed 5 hours to four children (A., M., N., O.) for a total of 20 hours, for therapeutic services, which is impossible as there are only 6.5 hours in a single school day. Therefore, at least 3 of the 4 billings were fraudulent on their face since there is no logical way that he rendered 20 hours of service in a 6.5-hour school day." (*Id.* ¶ 120(bb).)

In total, relators' third amended complaint includes 28 examples of alleged fraudulent billing post-acquisition by nine counselors. (*Id.* ¶¶ 120(a)–(bb).)

Relators allege that, "[b]ecause the fraud was so blatant and systemic, Century Park was apprehensive that the fraud would be exposed, so it directed [DCDT] to shut down its TDT program, effective November 1, 2019." (*Id.* ¶ 121.) Nevertheless, "Century Park[] allowed [DCDT] and DYS to keep the ill-gotten Medicaid proceeds from the TDT program rather than refund Medicaid for those proceeds." (*Id.* ¶ 122.)

Finally, relators allege that DCDT informed them in the fall of 2025 "that it was insolvent and on the verge of bankruptcy." (*Id.* ¶ 124.) Because of his roles with DCDT, including state

director of business development, Fields was privy to the fact that, at least during his tenure at the company, DCDT "had been grossing tens of millions of dollars from the TDT program[.]" (*Id.* ¶ 125.) Based on this knowledge, relators allege that "the insolvency of [DCDT] was likely caused by the transfer of assets from [DCDT] to its affiliates, including its indirect controlling owner Century Park." (*Id.* ¶ 126.)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). Generally, the Fourth Circuit "'liberally allow[s] amendment' so that cases may be resolved 'on the merits, instead of on technicalities.'" *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 231 (4th Cir. 2025) (quoting *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 197 (4th Cir. 2022)). Even so, the court may deny leave to amend "when granting it would 'be futile' or cause 'prejudice to the opposing party' or when the moving party has shown 'bad faith.'" *Id.* (quoting *MedCom Carolinas, Inc.*, 42 F.4th at 197). The court "may also use its discretion to deny leave to amend for other reasons consistent with 'what justice so requires,'" *id.* (quoting Fed. R. Civ. P. 15(a)(2)), such as "undue delay" and "repeated failure to cure deficiencies," *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## III. ANALYSIS

Relators urge the court to grant their motion for leave to amend, contending that "[t]he proposed amended complaint cures" the pleading deficiencies previously identified by this court based on "newly obtained and developed factual material." (Br. Supp. Mot. Am. 7.)[5] According

[5] When citing relators' brief, the court uses the page numbers assigned by CM/ECF rather than the page numbers added by relators.

to relators, their new allegations "provide the specificity required by [Federal Rule of Civil Procedure] 9(b);" thus, amendment is not futile. (*Id.* at 8.) Further, because the overbilling exemplars are newly obtained and no trial date is set, relators contend that their motion to amend is timely, that granting it will not unduly prejudice DCDT, and that there is no evidence of bad faith. (*Id.*) Accordingly, relators ask the court to grant them leave to amend. In opposition, DCDT contends that relators' motion to amend should be denied because it "is marked by undue delay" and bad faith, would unduly prejudice DCDT, and is futile. (Opp'n Mot. Am. 4–8, Dkt. No. 135.)[6]

A proposed amendment to a pleading is futile if it "is clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986) (citation omitted). The Fourth Circuit has "made clear that district courts are free to deny leave to amend as futile if the complaint fails to withstand Rule 12(b)(6) scrutiny." *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021) (citation omitted). But "conjecture about the merits of the litigation should not enter into the decision whether to allow amendment." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980). Accordingly, the court now considers whether the allegations implicating Century Park in the third amended complaint would withstand a motion to dismiss.

[6] In addition to the well-known Rule 15 factors, both parties advance alternative arguments as to why relators' motion to amend should, or should not, be granted. Specifically, relators contend that DOJ enforcement trends "confirm the viability" of their theory. (Br. Supp. Mot. Am. 8.) Relators also contend that justice warrants granting leave to amend in light of DCDT's alleged insolvency, which relators posit would render any future judgment "worthless" unless Century Park is reinstated as a defendant. (*Id.* at 8–9.) DCDT argues that the court should not revise its July 16, 2025 order dismissing all claims against Century Park pursuant to Federal Rule of Civil Procedure 54(b) because there has been no change in controlling law, no newly discovered facts, no misunderstanding of relators' previous arguments, and no legal error in the court's prior analysis that would warrant revising the prior judgment. (Opp'n Mot. Am. 8–10.) Because, as explained *infra*, amendment is futile, the court need not consider these arguments further.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In applying the plausibility standard, the "court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023) (citation omitted). The court, however, "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

"But allegations of fraud must also meet the more stringent 'particularity' requirement of Federal Rule of Civil Procedure 9(b)." *U.S. ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 (4th Cir. 2014). Under Rule 9(b), "an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted). That is, a complaint must plead "the who, what, when, where, and how of the alleged fraud." *United States ex rel. Wheeler v. Acadia Healthcare Co.*, 127 F.4th 472, 485 (4th Cir. 2025) (citation omitted).

In relevant part, the FCA provides:[7]

> any person who—
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

[7] As explained *supra*, because the FCA and VFATA are nearly "identical," the court analyzes Count IV, alleging that Century Park violated the VFATA, with Count III, alleging that Century Park violated the FCA. *Carranza*, 2022 WL 3226191, at *8 n.6.

> . . .
>
> (C) conspires to commit a violation of subparagraph (A) . . . ;
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(A), (C).

To state an FCA claim, a relator must allege

> (1) that the defendant made a false statement or engaged in a fraudulent course of conduct;
> (2) such statement or conduct was made or carried out with the requisite scienter;
> (3) the statement or conduct was material; and
> (4) the statement or conduct caused the government to pay out money or to forfeit money due.

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003) (citation omitted).

DCDT contends that relators' third amended complaint "still fails to plead facts" that establish: (1) "that Century Park presented or caused the presentation of a false claim"; (2) "that Century Park entered into an actionable FCA conspiracy"; (3) "that Century Park made or used materially false statements"; or (4) "that Century Park knowingly avoided an obligation to pay the government." (Opp'n Mot. Am. 7–8.) DCDT contends that, rather than curing the substantive pleading failures under Rule 9(b) previously identified by the court, relators' third amended complaint relies on allegations of Century Park's knowledge of the alleged fraud and ownership of DCDT rather than alleging specific facts concerning causation and presentment of the alleged fraudulent claims. (*Id.* at 8.)

In reply, relators urge that their third amended complaint is not futile because it cures the Rule 9(b) deficiencies previously identified by the court by providing the detailed allegations necessary to plead a connection between Century Park's active role in operating DCDT and the alleged fraud. (Reply 12.) According to relators, DCDT's futility arguments center on conspiracy as a basis for FCA liability and largely ignore the primary basis for liability alleged in the third amended complaint—"causes to be presented under § 3729(a)(1)(A)." (*Id.* at 13–14.) Relators further contend that the third amended complaint sufficiently pleads a conspiracy. (*Id.* at 14–17.)

**A. FCA Presentment**

Relators' third amended complaint operates under the "causes to be presented" basis of liability under the FCA. Indeed, the alleged fraud involves DCDT's overbilling for TDT services, a program which was discontinued 16 months after Century Park acquired DCDT. Relators' theory is that Century Park knew about the alleged fraud prior to acquiring DCDT, that Century Park directed DCDT to continue overbilling for TDT services and took an active role in overseeing DCDT's operations, and that, as a result, DCDT continued to fraudulently overbill the government for TDT services post-acquisition.

The third amended complaint includes significantly more detail about Century Park's alleged knowledge of the fraud and the fraudulent bills submitted to the government after Century Park acquired DCDT. Even so, the proposed amendment falls short of pleading causation. Indeed, relators' allegations as to Century Park's role in causing fraudulent bills to be submitted to the government hinge on the meaning relators perceive "executive" and "partner" to have. But making a mountain out of a mole hill does not satisfy the particularity requirements of Rule 9(b).

Relevant here, relators allege in their third amended complaint that:

> 110. On or around July 31, 2018, Century Park announced its acquisition of DYS (which includes [DCDT]) on Century Park's website.
>
> 111. In its announcement, Century Park indicated that it would play an active role in managing the operations of DYS (including [DCDT]) rather than acting as a passive investor. It articulated this in several statements in the announcement as follows:
>
> 112. Century Park stated that "Century Park Executive Council Member, Dr. Peter Zucker, will serve as Executive Chairman of the Board [of DYS]. Dr. Zucker has over 35 years of experience in the behavioral health care industry.
>
> 113. While a chairman of the board primarily engages in oversight of the company, the role of an executive chairman of the board is to also take part in the actual management of operations of the company."
>
> 114. Therefore, Century Park executive Dr. Zucker, in his role as executive chairman of the board of DYS, was using his "35 years of experience in the behavioral health care industry" to participate in the management of the operations of DYS. In other words, Century Park was going beyond the mere ownership of DYS and, through its executive Dr. Zucker, was directly participating in the management of the operation of DYS, which included [DCDT's] TDT program.
>
> . . .
>
> 116. Century Park's July 31, 2018 acquisition announcement also identified Chip Roehling[8] [sic] as "Managing Partner with Century Park" and quoted him as saying that the acquisition of DYS by Century Park was the "perfect opportunity [for Century Park] to partner with a highly regarded provider [DYS]."
>
> 117. In a partnership, each partner takes an active role in operating the business. Thus, Century Park thereby gave yet another indication that it was going to take an active role in the operation of DYS and [DCDT].
>
> 118. Subsequent to the acquisition of DYS and [DCDT] by Century Park, and after the departure of [relator] Marvin Fields from

[8] According to Century Park's announcement—which relators include as an exhibit—Chip's last name is Roellig, not Roehling or Roeling. (Dkt. No. 132-2.)

> [DCDT], Fields kept in touch with worker, staff and the management team of DYS and [DCDT], including TDT staff David Hagwood, Lataya Allen and Jamie Tribett (Site Supervisor), who indicated to Fields that "New Ownership," i.e., Century Park, was having them continue to bill 6–7 clients per day per counselor with total billable hours far exceeding the total hours in the school day. In other words, to continue the fraudulent Medicaid overbilling in the TDT program.
>
> 119. After Century Park's acquisition of [DCDT], Century Park had [DCDT] to continue [DCDT's] scheme and practice of overbilling Medicaid by billing the same hour of a [DCDT] counselor's time simultaneously to multiple children.

(Third Am. Compl. ¶¶ 110–19.)

Relators attach as an exhibit a copy of Century Park's acquisition announcement. (Dkt. No. 132-2.) But that announcement does not provide the definitions for "executive chairman of the board" and "partner" that relators allege. Indeed, relators' interpretation of the vague language in the promotional material that Century Park was excited for the "opportunity to partner" with DCDT as an allegation that the relationship was a "partnership" where the parties were both actively involved is unsupported by any factual material. Stated differently, the meaning that relators ascribe to the terms is merely conclusory. Although factual allegations must be accepted as true, the court need not accept conclusory statements couched as facts as true.

Further, although relators allege ample examples of post-acquisition overbilling, the statements of David Hagwood, Ataya Allen, and Jamie Tribett that "New Ownership" was continuing the practice of overbilling do not provide "the who, what, when, where, and how" of Century Park's causal role in the alleged fraud. *Acadia Healthcare Co.*, 127 F.4th at 485 (citation omitted). Century Park, as relators describe it, is a private equity firm that acquired DCDT as part of its acquisition of DYS in July 2018. (Third Am. Compl. ¶ 4.) Accordingly,

Century Park must be treated as an entity distinct from DCDT. (*See* Dkt. No. 132-2 (listing separate websites for Century Park and DYS).) To assert that Century Park engaged in an FCA violation, relators "must plausibly allege 'some degree of participation by [Century Park] in the claims process.'" *United States v. Universal Health Servs., Inc.*, No. 1:07-cv-00054, 2010 WL 4323082, at *2 (W.D. Va. Oct. 31, 2010) (quoting *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 59–60 (D.D.C. 2007)). The third amended complaint fails to connect Century Park "to an active role in the preparation and submission of [the alleged] false claims." *Id.* at *3. Indeed, aside from the two conclusory allegations based on Century Park's vague public announcement discussed *supra*, relators' only allegation regarding Century Park's participation in the claims process is that Hagwood, Allen, and Tribett said "New Ownership" was continuing the overbilling practice. This sole allegation falls far short of alleging "some degree of participation" with any particularity. In other words, relators have not sufficiently alleged that Century Park caused fraudulent bills to be submitted to the government.

**B. FCA Conspiracy**

Relators also have not alleged sufficient facts of a conspiracy between Century Park and DCDT. "To plead a claim for an FCA conspiracy, the relator must allege that the conspirators 'agreed that [a] false record or statement would have a material effect on the Government's decision to pay [a] false or fraudulent claim.'" *NISH*, 756 F.3d at 280 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 673 (2008)). Additionally, the relator must allege "that each member of the conspiracy joined the agreement and one or more conspirators knowingly committed at least one overt act in furtherance of the conspiracy." *United States ex rel. Miller v. Reckitt Benckiser Grp. PLC*, 698 F. Supp. 3d 889, 917 (W.D. Va. 2023) (citing *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014)).

The third amended complaint does not even adequately allege an agreement. Relators contend that their assertion that "Zucker asked whether the overbilling could continue after acquisition and received an affirmative answer" sufficiently alleges that there was an agreement between Century Park and DCDT. (Reply 16 (citing Third Am. Compl. ¶¶ 107–09).) As an initial matter, neither the third amended complaint nor either of Fields' declarations reference the "affirmative answer" described in relators' reply brief. Instead, the factual allegations simply state that, prior to the acquisition, Century Park executives knew about the fraudulent billing practice and indicated a "desire and intent" to continue the practice after acquiring DCDT. (Third Am. Compl. ¶¶ 106–09, 115.) On this issue, the third amended complaint alleges only:

> 106. Prior to Century Park purchasing DYS, on December 20, 2017, Relator Marvin Fields, who was [DCDT's] statewide director of business development at the time, met with key executives of Century Park, including Chip Roeling [sic] (Century Park's managing partner at the time according to its official website), Guy Zacsepinski, and Peter Zucker (who . . . Century Park on its website identified as a Century Park Executive Council Member).
>
> 107. At the December 20, 2017, meeting, the Century Park executives discussed with Fields his role at [DCDT] and his former role in directing the TDT program, how successful the TDT program was and specifics on how each area was profitable. Fields explained that a key to the high profitability of the TDT program was that each counselor had up to 5 or 6 clients at one time to whom the counselor was billing each client the same hour of time that the counselor physically was in the school, i.e., the triple, quadruple and quintuple billing of the same hour of counselor time that is fraudulent on its face.
>
> 108. Fields told them that the TDT program billing system was so financially successful that the annual gross Medicaid revenues for the Roanoke area schools alone were $7.5 million.
>
> 109. In their discussion with Fields, the Century Park executives indicated a desire and intent to continue the lucrative TDT program billing practices after an acquisition by Century Park of [DCDT] (and DYS) to ensure that the high profitability of the program was maintained after acquisition.

> . . .
>
> 115. As noted above, Dr. Zucker was one of the Century Park executives who met with Fields pre-acquisition, was informed by Fields that the (fraudulent) multiple billing for a single hour of a counselor's time was a key to the TDT program's high profitability and expressed, and who indicated to Fields a desire and intent to continue to multiple billing practice if Century Park acquired [DCDT], which it did.

(*Id.*) Nowhere in these allegations—or elsewhere in the third amended complaint—do relators allege that Fields was asked by Zucker if the fraudulent overbilling could continue or that Fields affirmed it could continue. Again, all that is alleged is that Century Park indicated a desire to continue the fraudulent overbilling.

Fields' declaration similarly does not contend that there was an agreement:

> I, Marvin Fields, on December 20, 2017, met with century park and its partners . . . to discuss what I did for the company with managing partner of Century park Chip Roellig, Guy Zacsepinski, Peter Zucker who was I believe a board member, and another ball [sic] headed gentleman who was a managing partner who I believe is not there anymore met with me. We discussed my role as State director of business development along with my former role in directing the TDT program and how it was so successful and how I got each area profitable after acquiring it.
>
> We discussed our billing system . . . . I explained that each counselor had up to 5 or 6 clients that they would bill on from either 730am–230pm if they were servicing elementary school, or 830am–330pm if they were servicing middle and high school. From their perspective they wanted to ensure that they could make the same amount of money or more in short time frame to recoup the money that would be allocated towards the purchase of the company. I told them that my gross that Roanoke alone earned was roughly 7.5 million in one year and that was due to having Roanoke City, Roanoke County, and Franklin County and that I was looking to get the area of Danville as well. Century Park wanted to know what the billing practices were so that they could follow suit to ensure that they were profitable just like [DCDT] was. . . .

(Dkt. No. 132-3.) Accordingly, no agreement is alleged.

Even if relators' assertion that, during the meeting with Fields, "Zucker asked whether the overbilling could continue after acquisition and received an affirmative answer" was included in the third amended complaint, it is not clear that it would meet the strictures of Rule 9(b). (Reply 16.) Indeed, such an assertion does not allege that Century Park made an agreement *with DCDT*. Instead, it only contends that Fields stated the fraudulent overbilling could continue and it is unclear whether Fields could enter into an agreement that it would continue on behalf of DCDT. Accordingly, relators have not sufficiently alleged an FCA conspiracy. Amendment is thus futile.

## IV. CONCLUSION

Relators' third amended complaint would not withstand a motion to dismiss; thus, granting leave to amend would be futile. Accordingly, relators' motion to amend (Dkt. No. 131) will be denied. A consistent order will be issued.

Entered: October 26, 2026.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge